# BETHLEHEM STEEL COMPANY

*vs.*

# RAYMOND CONCRETE PILE COMPANY.

*Negligence—Workman on Railroad Track—Corporate Entity—Railroad on Steel Plant—Workmen's Compensation—Instructions.*

Where the crew of a train, carrying materials in connection with defendant's steel works, knew that employees of a contractor were liable to be at work on the track, but nevertheless started the train backwards with no one on the rear thereof to give notice of its approach, and deceased was on the track between the train and the conductor when the latter gave the signal to start, *held* that there was evidence of negligence sufficient to go to the jury. pp. 73-75

One who, while in charge of men working on a railroad track, was killed by a freight train which, after standing still for about thirty minutes, was moved backwards without any person on the rear thereof to warn of its approach, *held* not guilty of contributory negligence, he having reason to assume that the train would not pass that spot without warning being given, and that the conductor would not give a signal for the train to move until he had seen that there was no one on the track. p. 76

The fact that there was no special exception to plaintiff's prayer directing a verdict for plaintiff if the jury found that the accident was caused by the negligence of defendant's employees in operating the train which ran over deceased, did not prevent a review of the action of the lower court in refusing to direct a verdict for defendant on the ground that those in charge of the train were not defendant's employees. pp. 76, 77

In an action against a steel company to recover for the death of one killed by a train operated by a railroad company which was controlled by the steel company, *held* that an instruction was erroneous which told the jury that liability could be im-

posed on the steel company if deceased was killed by a train being operated by "persons in the employ of or subject to the control of" the steel company, since the persons operating the train might have been in the employ of both companies and not operating the train in behalf of the steel company, and the reference to "control" might lead the jury to think that there could be a recovery against the steel company if it had control of the railroad company by ownership of stock and could for that reason be said to be in control of the train. p. 78

That a railroad was built entirely upon the land of a steel company, and that its principal business was the carriage. of materials for such company, which owned practically all of the stock of the railroad company, did not deprive the latter company of the character of a common carrier, it being such by its charter, it operating as such under the supervision of the Interstate Commerce Commission and the State Public Service Commission, and it carrying freight for others than the steel company when desired to do so.           p. 80

That the capital stock of a railroad company, with the exception of a few directors' shares, stood in the name of a steel company, for the benefit of which the railroad company was organized, and as a plant facility of which it was chiefly operated, did not destroy its separate corporate existence as distinct from that of the steel company, the railroad company having separate yardmaster's, superintendent's, and clerk's offices, its employees being paid their wages out of its own funds, its accounts being kept separately, and it having separate pay rolls.                                    pp. 81-86

When there is fraud, or some good ground for its action, a court may, in furtherance of justice, go behind the legal entity of a corporation, and treat it and the owners of the capital stock and assets as identical.           .           .           p. 81

In an action against a steel company for a death caused by a train operated on such company's property by a railroad company the capital stock of which was owned by the steel company, *held* that, under the circumstances, in order to justify a finding against the steel company, the jury should be required to find that the railroad company was merely an instrumental-

ity or adjunct of the steel company, or something to that
effect.                                                    p. 86

In an action, by the employer of one killed in the course of
his employment, for the use of the employer's insurer and the
dependents of deceased, against a corporation alleged to have
caused the death by negligence, to recover the amount of an
award made in favor of such dependents under the Workmen's
Compensation Act, a prayer submitted by plaintiff was erro-
neous which failed to require the jury to find that an award
had been made against the employer and insurer.           p. 87

The Workmen's Compensation Act does not authorize an
employer to sue for damages resulting to such employer from
the failure of another to keep the premises reasonably safe
for the employees.                                      pp. 87, 88

Section 58 of the Workmen's Compensation Act, authoriz-
ing an action by the employer against the person primarily
liable for the accident, to recover the amount of any award
against such employer, his insurer, or the State Accident Fund,
with the proviso that any excess recovered over the amount
of the award shall be paid to the dependents, does not authorize
an instruction to the jury, in such an action, by which the
dependents are given the total damages sustained by them by
reason of the employee's death, with an apportionment of the
whole amount among them, as in the case of an action under
Lord Campbell's Act.                                    pp. 86-88

The dependents of the deceased employee being in no case
entitled to recover, as against the person primarily liable, more
than the excess over the award and the employer's expenses
and costs of action, such person may properly complain of a
verdict against him in favor of such dependents for the whole
amount of damages sustained by them.                       p. 88

There is nothing in the Workmen's Compensation Law
which permits the dependents of the deceased employee to sue
after accepting compensation, and the law does not contem-
plate their obtaining an award and then in reality suing,
although the latter act is done in the name of the employer.
                                                           p. 89

That one doing construction work for a steel company, under a "cost plus" contract, was in effect the agent of the company, and that the company was, by force of the contract, ultimately to pay the premiums on the employer's liability insurance taken out by the contractor, did not relieve the company from liability for the death of an employee of the contractor which was caused by the negligence of the employees of the company.

p. 89

*Decided March 23rd, 1922.*

Appeal from the Superior Court of Baltimore City (AMBLER, J.).

Action by the Raymond Concrete Pile Company, for the use of the Ocean Accident and Guarantee Company, and for the use of Mary Graffius and others, widow and children of Edward Graffius. From a judgment for plaintiff, defendant appeals. Reversed.

Among the prayers submitted were the following:

*Plaintiffs' Prayer No. 1.*—The court instruct the jury that if they find from the evidence in this case that Edward Graffius was employed by the Raymond Concrete Pile Company to do the work or aid in doing the work of constructing the concrete trestle which it, the Raymond Concrete Pile Company, had agreed to construct for the Bethlehem Steel Company under the contract between those two companies, offered in evidence in this case, and while said Graffius was engaged in doing that work he was run over and killed by a train of cars which was being operated by persons in the employ 'of or subject to the control of the Bethlehem Steel Company, owing directly to the failure of said persons to exercise ordinary care in the operation of said train to avoid injuring said Graffius, then the verdict of the jury should be for the plaintiff.   (Granted.)

*Plaintiffs' Prayer No. 2.*—If the jury find a verdict for the plaintiff in this case they may, in estimating the damages to

be allowed, consider the pecuniary loss which they may find that the widow, Mary Graffius, has sustained by reason of the negligent killing of her husband, and in that connection may consider the reasonable probability of the continuation of the joint lives of the said Edward Graffius and Mary Graffius, but for said negligent killing of said Edward Graffius, and may allow such sum on that account as would compensate her for such pecuniary loss as she has sustained and reasonably will sustain by reason of the killing of her husband, and in estimating the damages which the said minor children, Elsie Graffius, Madeline Graffius, Edna Graffius, Josephine Graffius, Edward Graffius and Helen Graffius, have sustained and will sustain, they may consider what pecuniary loss they have sustained by reason of the negligent killing of their father, Edward Graffius, the prospective damages estimated up to the majority of each of said children and should render a verdict for the aggregate damages which they may find to have been sustained by both the widow and the children, but they should also in their verdict find and direct what should be the share of the said widow and what shall be the share of each of said minor children.   (Granted.)

*Defendants' Prayer No. 2½.*—The defendant prays the court to instruct the jury that the undisputed testimony shows that neither the defendant nor its agents were in charge of and operating the train which it is alleged caused the accident sued for in this case; nor is the said defendant responsible for any injuries arising from the operation of the train or railroad, which were neither under their operation nor control.   (Refused.)

*Defendants' Prayer No. 6.*—The court instructs the jury that there is a variance between the allegations of the declaration in the case and the evidence in the case, in that the plaintiff alleges that the accident mentioned in the evidence was caused by the negligence of the defendant, while the evidence shows that the negligence complained of was caused by employees of the Patapsco and Back River Railroad; therefore. their verdict must be for the defendant.   (Refused.)

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*Alexander Preston* and *R. Contee Rose,* for the appellant.

*William L. Marbury* and *Lucius Q. C. Lamar,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The Raymond Concrete Pile Company brought a suit for the use of the Ocean Accident and Guarantee Corporation and for the use of Mary Graffius, widow, and six infant children of Edward Graffius, deceased, against the Bethlehem Steel Company, for damages resulting from the death of Edward Graffius, alleged to have been caused by the negligence of the defendant. The concrete company was employed by the steel company to construct a concrete trestle, to replace a wooden trestle over which freight trains were operated, carrying material to and from the furnaces of the defendant company located at Sparrows Point, Md. Edward Graffius was employed by the concrete company as a foreman of some laborers in connection with the concrete work, and was killed while engaged in that work. The widow made application to the State Industrial Accident Commission, on behalf of herself and her infant children, for compensation, and an order was passed by the Commission, requiring the concrete company and the Ocean Accident and Guarantee Corporation, insurer, to pay her thirty dollars a week for 141 2/3 weeks for the use of herself and children. The appellee claims the right to sue, as it did, under the provision of article 101, section 58 of the Code. The appellant contends that there was no negligence proven on its part, that the deceased was guilty of contributory negligence, that under the circumstances a suit could not be brought by or for the equitable plaintiffs, as they had accepted compensation under the act, and that the accident was caused by a train owned and operated by the Patapsco and Back River Railroad, and not by the appellant.

This is an appeal from a judgment on a verdict in favor of the plaintiff for thirty thousand dollars, apportioned as follows: Mary Graffius, widow, $18,000, and $2,000 to each of six children of Edward Graffius, set out in the verdict and judgment. The only bill of exceptions in the record embraces the rulings on the prayers—the plaintiff having offered two, which were granted, and the defendant nine, all of which were refused except the last one, marked No. 7, which is the usual prayer instructing the jury as to contributory negligence.

As the defendant's prayers No. 1 and No. 1½ sought to take the case from the jury on the ground that there was no legally sufficient evidence, and No. 2 asked an instruction that, from the uncontradicted evidence, Edward Graffius was guilty of contributory negligence, we will first consider them—assuming for the purpose of the discussion that the steel company was responsible, if either it or the railroad company was.

The concrete company was engaged in constructing the concrete trestle referred to above, which was along or near a wooden trestle which was used for carrying fuel and ore to the furnaces of the defendant. That was about twelve feet high, the trestle being elevated so that the cars could be loaded and unloaded more conveniently. The concrete trestle was constructed close to the wooden trestle, and in the construction there was used what is called a concrete mixer, which was on or near the old trestle, as the wooden one is called by some of the witnesses. There was a conveyor which lifted the material from the ground level into the mixer. The mixer was on the old trestle, but not on the tracks.

There was a train consisting of five cars and an engine which came on the old trestle. The train was moving backwards—the cars being in front of the engine, as the train was thus moving, and it had started to go to the ore pile to get coke for the furnaces, but stopped on the trestle. Graffius was in charge of the gang working on the concrete trestle.

He went on the old trestle, where the concrete mixer was, and was getting ready to pour some new bents in the new trestle and got on a track on the old trestle. The witness Cook described his position as follows: "Graffius was in the middle of the track, about here (indicating). He removed his rule from his pocket and opened it up. He was facing this direction (indicating), by the way. He opened the rule and squatted down between the rails and held his rule at arm's length ahead of him, and was using it for a plumb bob or sight line, to line or sight something down here" (indicating).

The train of five cars was standing on the trestle—Cook said perhaps a hundred feet from Graffius—but the witness Shockney said it was nearer Graffius. There was an electric motor at a switch on the trestle below where the train stopped. The train started to move, and the electric motor began to blow its whistle in short blasts, which attracted the attention of Cook and some of his men, who attempted to warn Graffius, but apparently he did not hear them, by reason of the noise of the furnace. The train was moving backwards and the drawbar coupling struck Graffius in the back of the neck and, to use the language of the witness, "Just bowled him over and he went in under the pockets" of the car. Cook said the train had stood there possibly twenty-five or thirty minutes, and that Graffius had been on the track possibly eight or ten minutes before the train started. According to his evidence the concrete mixer was on the other side of the old track, and they made the concrete there and then hauled it across the track on the new trestle, and Graffius was apparently lining the new forms.

The train crew was short of a brakeman that day, and the conductor had ridden down on the rear of the train. He stopped the train on the trestle, because he knew there was this concrete mixer near the track he would pass on, where there were fifteen men working, of which Graffius was foreman. The conductor got off the rear end of the train and walked down the trestle to the switch, which was about six

car lengths below. As he did so he saw Graffius and told him
that he would be going back and forth with the cars, transfer-
ring coke all day, and to keep the men off. He replied, "All
right, Cap," and the conductor went on down to the switch.
On his way back when he was about half way—three car
lengths from the rear of his train—he signaled it to move
back. He said he could see the hind end of the train plainly,
but did not see Graffius—that he did not know whether he
could have seen him if he was kneeling on the ties, as there
was a guard box there that covered a third rail used for the
operation of the electric motor, and if he was behind that
guard box it may have been possible that he could not have
seen him. He thought Graffius was struck about twenty feet
from where the rear of the train had been standing. He said
he stopped the train at the point he did because he knew that
there was a bunch of men working at that place, and he went
to the switch so that he could see both sides of the train where
there were men working. He passed the place where the con-
crete mixer was, as he went to the switch, and there was no
one on the track he was operating on, but there were men
working on the trestle. He was asked: "Why didn't you
look to see if there was anybody behind that guard box before
you gave that man the signal to start the train?" and replied:
"I do not know just why I did not walk up there and look."
He and other witnesses said that, as the train was backing,
there was no one on the rear. The engineer and fireman were
on the engine and could not see if anyone was on the track
beyond the rear car, as they were high cars. There can be no
doubt that there was ample evidence of negligence of the men
in charge of the train—at least of the conductor—to go to the
jury. There were men working on the new trestle, close to
the old one, under a contract made between the concrete com-
pany and the steel company, and it was known to the crew on
the train that men were liable to be on the track or so close
to it as to be in danger, and yet the train was run that morn-
ing without anyone on the rear of the train to give notice of

its approach, and Graffius was between the train and the conductor when the latter gave the signal for the train to move.

We are also of the opinion that the court could not properly have taken the case from the jury on the ground of contributory negligence of Graffius. The train had been standing there for some time, according to one witness for twenty-five or thirty minutes, and as Graffius talked with the conductor on his way down the track, he might well have taken for granted that some warning would be given before the train was started. The conductor had been riding on the rear of the train before he stopped it on the trestle, and although he told Graffius he was short of a brakeman, Graffius might well have thought that the train would not pass by where he was working until the conductor, or some one, would give warning, and that the conductor would not give a signal for the train to move until he had seen that there was no one on the track, as he could very well have done if he had used proper care under all the circumstances. It was not only not shown that Graffius had no right to be where he was, but there is some evidence tending to show that he could not have done the work he was doing to advantage elsewhere. Without dwelling on this question longer, we are of opinion that under the facts and circumstances the court was clearly right in submitting to the jury the question of negligence and of contributory negligence of Graffius, and the prayers of the defendant marked Nos. 1, 1½, and 2, were properly rejected.

The question whether the evidence did not affirmatively show that the steel company was not the responsible party and that the defendant's prayers Nos. 2½ and 6 should have been granted, has given us more difficulty. In passing we will say that the point, raised at the re-argument by the appellee, that inasmuch as there was no special exception to the plaintiff's first prayer, that question is not open for review, is in our judgment not well taken. For that contention the cases of *Bentley, Shriver & Co. v. Edwards*, 100 Md. 652, and *Baltimore Briar Pipe Co. v. Eisenhauer*, an unreported case

noted in 107 Md. 704, and to be found in 66 Atl. 623, are re-
lied on. Without stopping to discuss the question at length,
we will say that a marked distinction between this case and
those is that in this case, while there appears no *special*
exception to the plaintiff's prayer, there was a general excep-
tion to granting it, and to refusing the defendant's prayers,
while in those cases, there was *no* exception to the plaintiff's
prayers. There is a statement in the Briar Pipe Company
case which perhaps might be construed to hold that because
there was no *special* exception to the plaintiff's second prayer,
those of the defendant could not be reviewed. That state-
ment was wholly unnecessary, as there was no exception of
any kind to that prayer, and if it can be construed to mean
what is contended for, it must be understood as not being in
accordance with our settled practice and overruled to that
extent.

But in addition to what we have said, there can be no doubt
about our right to review the plaintiff's prayer, to determine
whether it is correct under the facts in this case, and we will
consider that in connection with the defendant's prayers above
mentioned. We will ask the reporter to publish the two
prayers of the plaintiff with the report of the case.

The evidence in this case tends strongly to show that the
railroad company, and not the steel company, was operating
the train which caused this accident, and no reason is shown
why the railroad company could not have been sued, or could
not have been made to respond in damages, if recovered in
this case. In order to hold the steel company liable, the
corporate entity of the railroad company must be ignored, and
the railroad company treated as a mere instrumentality or
adjunct of the steel company. Whether it can properly be so
treated involves a nice and delicate question, and yet the
only instruction given the jury, that in any way reflects on
the question, is that Graffius was killed "by a train of cars
which was being operated by persons in the employ of or sub-
ject to the control of the Bethlehem Steel Company." That

is not only too general, but it is very misleading under the
facts of this case. The point was expressly raised at the trial
below and a good deal of evidence offered on the subject, but it
was almost ignored in the prayers—there being nothing except
what we have quoted above given to the jury on the subject.
It was such a close question in the opinion of this Court that
we, on our own motion, asked for a re-argument of that and
some other questions involved. We felt that justice to both
parties required that action, and it seemed to us that under
such circumstances as are in this case, the authorities to which
we had been cited, and which we had found, at least left the
question in grave doubt. Yet the jury was given practi-
cally nothing to guide them in passing on the question, and
what was in the instruction on this subject was calculated to
mislead them. To tell the jury that all that was necessary to
hold the steel company (instead of the railroad company) was
to find that the train was being operated by persons in its
employ, was not enough. The plaintiff claims that at least
one of them was in the employ of both companies, although
we do not so understand the witness, but even if he was, it
did not follow that he was then, in operating the train, doing
so for or in the employ of the steel company. And to tell
the jury that there could be a recovery if they found those
operating the train were subject to the control of the steel
company might have easily led them to believe that there
could be a recovery if the steel company had control of the
railroad company as owner of the stock, and could, for that
reason, be said to be in control of the train when the accident
happened. That is going beyond what the authorities justify.

The Patapsco and Back River Railroad Company was in-
corporated under article 23 of the Code of 1888, and amend-
ments, in December, 1916. The capital stock was five hun-
dred thousand dollars, divided into ten thousand shares of
fifty dollars each. All the incorporators were, at the time, in
the employ of the steel company, and the minutes of the
annual meeting, held in January, 1918, show that the steel

company, by its proxy, nominated seven directors, who were duly elected. This accident occurred January 11th, 1919, and the directors elected according to those minutes were still in office.

There were about sixty miles of railroad tracks at Sparrow's Point. The most, if not all of them, were originally built by the Bethlehem Steel Company, or the Maryland Steel Company, which it succeeded, but when the railroad company was incorporated, the structures on the right of way, consisting of the tracks, ballast and ties, were turned over to it, and the right of way was leased by the steel company to the railroad company. The concrete trestle was being built by the steel company, as it owned the wooden trestle, which was treated as a part of the right of way, and which it leased to the railroad company. The terms of the lease and the precise agreement or arrangement between the two companies are not given in detail in the record, but the steel company does own all of the ground upon which the tracks were laid.

No question has been raised about the validity of the charter of the railroad company, and, as it was chartered in December, 1916, it was required to have the approval of the Public Service Commission of Maryland. The railroad is connected with the Pennsylvania Railroad Company and with the Western Maryland Railway Company at the south end of Bear Creek Bridge, the dividing line between the property of the Pennsylvania Railroad Company and that of the steel company, and joins the Baltimore and Ohio Railroad Company at Bear Creek Junction, at the dividing line between the property of the Baltimore and Ohio Railroad Company and that of the steel company. It has various branches throughout Sparrow's Point and vicinity, although it is wholly on the steel company's property, which one of the witnesses described as extending from the end nearest Baltimore to the lower end called the breakwater, being possibly about two miles and a half, and the other way from the tin plate mill to the waterfront, being about a mile and a half.

The railroad company "has tariffs issued and collects demurrage from its various customers under the sanction of the Interstate Commerce Commission," and "those tariffs are all issued under the Public Service Commission of Maryland also." It has twenty-five steam locomotives—marked P. and B. R. R. R. besides the rails, ballast, ties, etc., on its sixty miles of tracks. It has offices of its own. Its cashier is also cashier of the steel company, but its superintendent, who has been such since its organization, is not employed by the steel company. It is a common carrier under its charter, and it does actually serve people other than the steel company. Mr. Newlin, the cashier, testified that "the farmers in that vicinity in the summer time have their material loaded and the cars placed there at the Patapsco and Back River R. R. office for their benefits," and it carries freight for sub-contractors that work in connection with the steel company work. It is liable to have to carry for others, if they want it done. As said by Mr. Justice Day, in *Tap Line cases,* 234 U. S. 1, on page 24: "It is insisted that these roads are not carriers because the most of their traffic is in their own logs and lumber, and that only a small part of the traffic carried is the property of others. But this conclusion loses sight of the principle that the extent to which a railroad is in fact used does not determine the fact whether it is or not a common carrier. It is the right of the public to use the road's facilities and to demand services of it, rather than the extent of its business, which is the real criterion determinative of its character." It is said in that case, quoting from the syllabus for convenience, "Although a railroad may have originally been a mere plant facility, after it has been acquired by a common carrier duly organized under the law of the state and performing service as such and regulated and operated under competent authority, it is no longer a plant facility, but a public institution, even though the owner of the industry of which it formerly was an appendage is the principal shipper of freight thereover."

The train that caused the accident complained of was apparently being run by the railroad company. Its superintendent had charge of the operations of the work of the road, and he was not connected with the steel company. The conductor in charge of the train was employed and paid by the railroad company. He wore a badge of the Patapsco and Back River R. R. Co., as the other members of the train crew did. In his examination there was some question about the pin on the badge, which was marked, "B. S. Co." but he explained that he had simply used the pin of the old badge which he had before the railroad was organized. The railroad company has a yardmaster's office, superintendent's office, and the clerks have an office. The employees were paid their wages out of the railroad company's funds, and the accounts were kept separately. It had separate payrolls, and checks of the railroad company were sent to the cashier upon requisition that he made on the Patapsco and Back River R. R. Co. at Bethlehem. There was a building built for it at Sparrow's Point, and it was a separate organization, although primarily organized for the benefit of the steel company.

The fact that the capital stock was in the name of the steel company, with the exception of a few shares given to or held by directors for the purpose of qualifying them, could not make it any the less a corporation. In *Pott & Co.* v. *Schmucker,* 84 Md. 535, one person took the entire capital stock, but allotted four shares of it to four employees, and the corporation was held valid, "because the requirements of the general incorporation law, under which the company was formed, were substantially complied with." When there is fraud, or some good ground for its action, in furtherance of the ends of justice, it is true that a court has the power to go behind the legal entity and treat the corporation and the owners of the capital stock and assets as identical. The case of *Pott & Co.* v. *Schmucker, supra,* cited several cases where it had been held that that could be done, and in *Folsom & Co.* v. *Dietrich Fertilizer Co.,* 85 Md. 52, we have an instance

of the Court protecting creditors against an improper use of corporate powers. Those cases were in equity.

The appellee has cited such cases as *Chicago, M. and St. P. Ry. Co.* v. *Minneapolis C. and C. Assn.,* 247 U. S. 490; *United States* v. *Lehigh Valley R. R. Co.,* 220 U. S. 257; and *United States* v. *Reading Co.,* 253 U. S. 26; but they do not relieve us of the difficulty. There can be no doubt that courts "both at law and in equity will disregard the fiction of corporate entity apart from the members of the corporation, when it is attempted to be used as a means of accomplishing a fraud or an illegal act." 14 *C. J.* 61. It is also said on page 59 of that volume, that "a holding corporation has a separate corporate existence, and is to be treated as a separate entity, unless the facts show that such separate corporate existence is a mere sham, or has been used as an instrument for concealing the truth." In a note on that page, it is said: "It is only when necessary in furtherance of justice, and usually when there are elements of fraud or estoppel, that corporate entity may be disregarded, either at law or in equity." Many similar expressions may be found in the books, and in Maryland we have not hestitated to go behind a corporate existence when necessary, but is there sufficient reason for that in this case? There is no fraud alleged, no attempt to evade any law, no suggestion that the railroad company is not perfectly able to answer for any damages it causes others to sustain.

The Maryland cases relied upon by the appellee widely differ from this. In the *Pugh Case,* 134 Md. 196, both of the corporations were street railway companies—public service companies. The Washington Railway and Electric Company system embraced all of the companies. The passenger suing in that case was going from Rockville to Washington, and she had paid her fare through. It was contended that the appellee in that case was not responsible because, at the point where the accident complained of occurred, the car in which Miss Pugh was riding was on the part of the tracks which were

owned by the Georgetown Company, but we held that that would make no difference, and said that "the defendant was just as much responsible for that conductor being in charge of that car as the Georgetown Company was, for, at most, it was a joint employment of him by the two companies." The action or inaction of the conductor was what was complained of. A careful examination of the facts in that case will show the marked difference betwen it and the one now before us. The case of *Washington & Rockville Ry. Co.* v. *Sullivan,* 136 Md. 202, relied on the *Pugh Case* for the liability of those companies under a very similar state of facts. In the *Swindell Case,* 132 Md. 274, the railway company and the bus company were engaged in the same business—carrying passengers on the streets of Baltimore City. The admission of Mr. Thom, the general attorney and vice-president of the United Railways Company, that "for all practical purposes you may say that the control, for operating purposes, is in the United Railways and Electric Company," and the evidence in that case, tended to show that the railway company did direct and control the bus company. We said that "the evidence of Mr. Thom was legally sufficient to go to the jury as tending to show that the bus company was controlled in its operations by the railway company; but should it be otherwise regarded, the prayer for such reasons could not be held bad, as there was no special exception taken to it." We relied on, to a considerable extent, the case of *Foard* v. *State,* 219 Fed. 829, and the cases there cited, but an examination of that case will show that it is very different from this, although very applicable to the *Swindell* case.

In the article on corporations, in 14 *C. J.* 52, written for the most part by the late William L. Clark, who before his death had made an enviable reputation as a law writer, the general doctrine that, for most purposes, a corporation becomes in law a legal entity, or artificial person entirely distinct from its members and its officers, is stated, and it is added that, "this doctrine applies even in the case of a corpo-

ration sole, or a corporation aggregate, whose shares are all owned by one or a few persons. And the rule applies as well, where the stock of a corporation is owned partly or entirely by another corporation, as where it is owned by natural persons, so that there is no identity betwen a corporation owning practically all of the stock in another corporation and the latter corporation." 14 *C. J.* 53.

So, on page 58, the effect, when several corporations are owned by the same parties, is considered and the conclusion announced that, "there is no identity between the two corporations, and neither is liable for the acts or faults of the other, merely because of the identity of the members, or stockholders and officers."

In the notes, a great many cases are cited from federal and state courts, amongst others, *Illinois Central R. Co. v. Buchanan,* 88 S. W. 312, 27 Ky. L. Rep. 1215, where a railroad hospital association was organized as a corporation independent of the railroad company, but by its articles, its directors were declared to be certain officers of the railroad company, and all employees of the railroad were made members, but it was held that the hospital corporation was a separate and distinct organization from the railroad company, and that the latter was not liable for the conduct of the hospital directors, nor for the negligence of physicians or attendants of the hospital in treating railroad employees. In the case of *In re Watertown Paper Company,* 169 Fed. 252, the stockholders of a paper company caused the organization of a pulp company, with funds advanced by the paper company, but for the account of its stockholders, and while the two corporations mingled their affairs, the paper company purchasing its pulp from the pulp company, and the controlling stockholders regarding the two corporations generally as different departments of their business, etc., it was held that the separate existence of such corporations was not fraudulent, nor were they so conducted as to make one a mere adjunct of the other, so as to prevent the recovery of claims of the pulp company against the paper company.

In 14 *C. J.* 62, it is said that the fiction of corporate entity has been disregarded in order to do justice in determining rights and liabilities, where the same persons have associated themselves together under corporate names and organizations for the purpose of carrying out several branches of a single common enterprise, and that "the legal fiction of distinct corporate existence may be disregarded in a case where a corporation is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality or adjunct of another corporation." A number of federal cases and some in state courts, are cited to sustain that statement, but most of them are either in equity, or where equitable principles were being applied. After giving illustrations, including *Foard's Case, supra,* it was said, in note (B) 14 *C. J.* 63: "Ordinarily however, the fiction of distinct corporate entity is adhered to, and the two corporations are treated as distinct entities. While the legal fiction of distinct corporate existence will be disregarded when necessary to prevent fraud, or when a corporation is so organized and controlled and its affairs so conducted as to make it only an adjunct or instrumentality of another, it requires a strong case to induce a court of equity to consider two corporations as one, on account of one owning all of the capital stock of the other." *Pittsburgh & Buffalo Co.* v. *Duncan,* 232 Fed. 584. In *United States* v. *Milwaukee Refrigerator Transit Co.,* 142 Fed. 246, JUDGE SANBORN said: "If any general rule can be laid down in the present state of authority, it is that a corporation will be looked upon as a legal entity, as a general rule, and until sufficient reason to the contrary appear; but, when the notion of a legal entity is used to defeat public convenience, justify a wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." See also what was said by Lord Herschel, in speaking for the House of Lords, in *Salomon* v. *Salomon & Co.,* L. R. (1897) App. Cas. 22. We will not stop to quote from that case, although an important one, and it will be seen that it has been practically adopted on

another point in *Tompkins v. Sperry, Jones & Co.,* 96 Md. 560, 581.

We have thus gone very fully into the facts of this case, and into a consideration of the authorities on the subject, because it seems to us clear that there is not enough in the plaintiff's first prayer on the subject, and it is defective because it did not give the jury sufficient information to enable them intelligently to pass on the question. The jury should, under such circumstances as exist here, be required to find that the railroad company was merely an instrumentality or adjunct of the steel company, or something to that effect, to justify them in finding for the plaintiff against the defendant, and there is not sufficient in the plaintiff's first prayer. We are, however, of the opinion that defendant's prayers No. 2½ and No. 6, as well as its prayer No. 1, in so far as it relates to this question, could not have been granted. There are some questions, such as the terms of the lease of the right of way and the arrangement between the two companies, referred to by the superintendent of the railroad company, which are left in the record very much in doubt, and there is sufficient to require the question to be submitted to the jury. The defendant's prayers could not, therefore, have been granted, but there were errors in the plaintiff's first prayer, as we have pointed out.

We have not thought it necessary to discuss the question whether the expression "owing directly to the failure of said persons to exercise ordinary care in the operation of said train," etc., when taken in connection with the defendant's prayer No. 7, which was granted, was sufficient, but we will refer to another defect in the first prayer of the plaintiff in connection with what we say about the second.

In the plaintiff's first prayer there is no reference whatever to the payment of compensation for the death of Edward Graffius, either by the employer or the insurer. Section 58 of article 101, before the Act of 1920, was as follows:

"Where the injury or death for which compensation is payable under this article was caused under circumstances creating a legal liability in some per-

son, other than the employer, to pay damages in re-
spect thereof, the employee, or, in case of death, his
personal representatives or dependents as hereinbefore
defined, may proceed either by law against that other
person to recover damages, or against the employer
for compensation under this article, or in case of joint
*tort feasors,* against both; and if compensation is
claimed and awarded or paid under this article any
employer may enforce for the benefit of the insurance
company or association carrying the risk, or the State
Accident Fund, or himself, as the case may be, the
liability of such other person; provided, however, if
damages are recovered in excess of the compensation
already paid or awarded to be paid under this article,
then any such excess shall be paid to the injured
employee or, in case of death, to his dependents, less
the employer's expenses and costs of action."

That section did not permit dependents to proceed against
the "other person" *and* against the employer for compensa-
tion, but only against the one *or* the other. The first count
in the declaration expressly refers to the Act of 1914, ch. 800,
which includes section 58 of article 101 in the Code, and the
count refers at length to the award, and the liability of the
concrete company, as employer, and the guarantee corpora-
tion, as insurer, to pay the award, is relied on for the right
of the concrete company to bring this suit. It could not sue
under section 58 the defendant for the death of Graffius on
any ground other than those authorized by the statute, and
yet there is not the slightest reference in either prayer to any
compensation awarded or paid by either the employer or
insurer. It is difficult to understand upon what theory the
second count could be introduced, when we remember that it is
a suit by the concrete company, although for the use of the
guarantee corporation, and the widow and children of Graf-
fius. It alleges that it was the duty of the defendant to keep
the premises reasonably safe for the plaintiff's employees, but
there is nothing in the Workmen's Compensation Act authoriz-

ing an employer to sue for damages so resulting to itself from a failure to do so. When the plaintiff demurred to the defendant's pleas, the demurrer mounted up and the declaration could have been declared defective by reason of the second count, unless it must be said that the demurrer mounted up to the whole declaration and not to each count, and hence if there was one good one, the declaration could not have been declared defective. The record is in confusion, and it is difficult to determine just what did happen. It reads: "Demurrer to defendant's second and third pleas in open court. 28 March, 1921—Demurrer to defendants second and third pleas overruled. Same day, defendants decline to plead over." As the defendant declined to plead over, apparently the demurrer was sustained, but the record does not say so. But, however that may be, the first prayer instructed the jury that if they found the facts set out in it, then their verdict should be for the plaintiff—yet there is nothing whatever in that prayer calling upon the jury to find what was absolutely necessary, regardless of other questions of fact, viz., as to the award against the employer and insurer, in order to entitle the plaintiff to recover. Then when we come to the second prayer, it is like one in a suit brought under Lord Campbell's Act, and as a result, the verdict of the jury was not for what the plaintiff or the insurer had the right to recover, and then any excess for the dependents, but wholly and only for the damages sustained by the dependents for the death of Graffius— the whole amount being apportioned between the widow and children and judgment entered accordingly. It may be said that the defendant cannot complain of that, but it certainly has a right to complain of a verdict for thirty thousand dollars in favor of a widow and children when, under no circumstances, were they entitled to more than the excess over the award and the employer's expenses and costs of action. Who has any right to take from the infant children any portion of the two thousand dollars awarded each of them, or the eighteen thousand dollars given to the widow, unless she

chooses to allow it? But beyond that can it be said that the defendant would not be injured? The question is raised whether the concrete company had the right to sue the steel company at all, as, under their contract, the concrete company agreed to insure its employees and the steel company agreed to pay, and did pay, the premiums, but it cannot well be denied that the average jury is more liberal in allowing damages in favor of a widow and children of one alleged to have been killed by the defendant's agents than it would be where an employer or an insurer was seeking to recover. But, beyond all that, there is nothing whatever in the law which permits the dependents to sue after accepting compensation, and the law does not contemplate their obtaining an award and then in reality suing, although the latter act is done in the name of the employer. Under Lord Campbell's Act the amount recovered is divided into such shares as the jury shall find and direct, while, under the Compensation Act, it is divided as the Commission may deem just and equitable. A suit under Lord Campbell's Act must be brought within twelve months after the death of the party, while under the Compensation Act, there is no such requirement, as to the excess an employer is authorized to recover.

We are of the opinion that both the first and second prayers of the plaintiff were defective for the reasons we have given.

We do not think the third and fourth prayers of the defendant could properly have been granted. If the concrete company was the agent of the steel company, and the latter under their agreement paid the premiums for the insurance of the employees, that would not relieve the steel company, if its agents were guilty of negligence resulting in the death of an employee of the concrete company, from liability for that. The agreement between the concrete company and the steel company certainly did not contemplate the steel company running down one of the employees of the concrete company, as is alleged in this case, and if it, instead of the railroad company, is the proper party to sue, we do not think that the steel company would necessarily be relieved by reason of the

contract made with the concrete company. The concrete company was the employer, within the meaning of the Compensation Act, and it would cause great confusion if such a party as the steel company to an agreement of this kind, which is really what is known as a "cost plus contract" would be relieved, simply because it ultimately paid the premiums for the insurance. The concrete company was not required by that contract to take out more insurance than the Compensation Act provided for, and, indeed, it was limited by the act.

Nor do we think that there was error in refusing the defendant's prayer No. 5. It follows that, for reasons we have given, the judgment must be reversed, but we will award a new trial.

> *Judgment reversed, and new trial awarded, the appellee to pay the costs in this Court, the costs below to abide the final result.*