# BALTIMORE CITY COURT.

Filed December 14, 1928.

GENERAL TIRE COMPANY, A MARYLAND CORPORATION,

VS.

THE FLOYD COMPANY, A CORPORATION, PAUL C. WOLMAN AND A. B. MAKOVER, RECEIVERS.

*Martin Lehmayer* and *Herman M. Moser* for plaintiff.

*Jacob Kartman* and *Paul C. Wolman* for defendant.

FRANK, J.—

This case was tried before the Court without a jury. It is an action to recover for the balance due for merchandise sold and delivered by the plaintiff to the defendant corporation, for which the individual defendants were subsequently appointed, and duly qualified, as receiver. It is conceded that the defendant corporation is indebted to the plaintiff in the amount of $2,621.29. The defendants present a set-off in an amount, which, first stated in their bill of particulars to be $4,236.19, was reduced voluntarily to the sum of $2,788.48. If the counterclaim is maintained in its entirety, the defendants will be entitled to a verdict for $167.19 against the plaintiff. It is the validity and extent of this claim or set-off that constitutes the questions at issue in this case.

The defendant corporation has for a number of years been engaged in the business of selling automobile tires in Baltimore City. It will be hereinafter

referred to as the "Floyd Company." The plaintiff is a Maryland corporation and will be spoken of as the "Maryland corporation." The counterclaim of the Floyd Company is contended by the Maryland corporation to be maintainable, if at all, against the General Tire and Rubber Company, a corporation of the State of Ohio, which is herein designated as the "Ohio corporation." The Ohio corporation is a manufacturer and distributor of automobile tires. Its factory and principal place of business are in Akron, Ohio. From September, 1921, until the latter part of 1926, or thereabouts, the Floyd Company had been its local distributor in Baltimore and, while this relationship existed, and before the inception of the Maryland corporation, some of the transactions, involved in the claim of set-off, had arisen.

In the summer of 1926, the Ohio corporation determined to make other arrangements for the distribution of its tires (known as "General" tires) in this city. It leased for a term of years, the store property at No. 914 Cathedral street. In November, 1926, Michael J. Sweeney, who had been one of its salesmen, and two others then or theretofore connected with it, formed the Maryland corporation. Its capital stock was $25,000. Of this the Ohio corporation subscribed for 254 shares of the par value of $50, aggregating $12,700; Sweeney for 123 shares, aggregating $6,150. Roche, one of the other two incorporators, subscribed for the remaining 123 shares. None of these shares appear to have been paid for in cash. Each of Sweeney and Roche gave to the Ohio corporation his demand notes for $6,150 on the theory that that corporation would advance the money to pay for the shares subscribed by each. Subsequently, Roche terminated all relationship with the Maryland corporation and. Sweeney took over his stock subscription. Roche's note was returned to the Ohio corporation and Sweeney gave to the Ohio corporation an additional demand note for $6,150. Thereafter for the first time, stock certificates were issued to the Ohio corporation for 254 shares, to Sweeney for 246 shares. Sweeney has never paid anything to the Ohio corporation on account of his said notes, either by way of principal or of interest. Whatever payments have been made upon these subscriptions to the capital stock. of the Maryland corporation, seem to have been by way of delivery of tires by the Ohio to the Maryland corporation, but it is difficult to determine from the evidence just what may be the extent of these payments. In all substantial particulars its separate corporate organization seems to have been effected and maintained. Employees, while so acting, have not been connected with the Ohio corporation.

The Maryland corporation deals only in the General Tires of the Ohio corporation. The former's by-laws provide that its directors' meetings shall be held either at its office in Baltimore City or at the office of the Ohio corporation in Akron, Ohio.

The Ohio corporation on August 17, 1926, applied to and obtained from the landlord of the premises, No. 914 Cathedral street, permission to sublet the said premises to a corporation to be formed, stating, through its attorney, that it would organize a subsidiary corporation, under the laws of Maryland, to be known as "The General Tire Company." It advanced to the Maryland corporation as a loan the money required to make the improvements to adapt it to the purpose of the latter's business.

In December, 1926, Sweeney and Roche visited William C. Floyd, president of the Floyd Company, in his bedroom, to which he had been confined for some time, as the consequence of a paralytic stroke. The talk was of the new store on Cathedral street. Floyd and his wife testified that Sweeney and Roche said that the Ohio corporation was opening this as a branch store, but urged Floyd not to let this be known, as, if it were to become public, other manufacturers would wish to open branches in the city. Floyd testified that they told him that his company would get his tires from the Baltimore store and would pay the factory prices plus a compensation of 2 per cent. to the Baltimore store for carrying the stock. That he was not to get any tires from Akron, but that, if he wanted any tires, he would just send down to the store. Sweeney (Roche was not produced as a witness) denied that he told Floyd that the Baltimore store was to be a branch of the Ohio corporation and that he had told Floyd that this was

to be kept secret. He testified that he told Floyd that there were to be two distinct corporations, separately conducted.

In the beginning, all tire adjustments of the Floyd Company were handled by the Maryland corporation. Sweeney testified that they had become too troublesome for him and were thereafter taken up directly between the Floyd Company and the Ohio corporation. The Ohio corporation would issue its credit memoranda to the Maryland corporation which passed them on to the Floyd Company. The Maryland corporation without question allowed all credits directed to be allowed by the Ohio corporation. All others were refused. In other words, the Maryland corporation never made allowances for adjustments, for which it in turn did not receive credit from the Ohio corporation, the manufacturer, a usual business practice. Upon shipments weighing in excess of one hundred pounds, the Ohio corporation paid the freight. Upon shipments of less than one hundred pounds, the Maryland corporation paid the freight.

The Maryland corporation indorsed and deposited in its own bank account in Baltimore two checks of the Floyd Company, made payable to the Ohio corporation. These, however, were isolated transactions. The Maryland corporation always maintained its own separate bank accounts and system of accounts with its customers. It had numerous transactions with a large number of customers, other than the Floyd Company, in none of which, so far as the evidence discloses, the Ohio corporation was in any manner involved. The alleged domination by the Ohio corporation is claimed to have appeared only in the transactions with the Floyd Company. As far as the evidence discloses, all of the other considerable business of the Maryland corporation was done as a completely independent entity.

Upon the Maryland and Federal authorities, the state of facts above set out require at least the submission to the Court, sitting as a jury, of the question of whether the Maryland corporation was merely an instrumentality or adjunct of the Ohio corporation. If the Court, sitting as a jury, should so find, then "the legal fiction of distinct corporate existence may be disre-

garded, and the two corporations" treated as a mere association. Bethlehem Steel Co. vs. Raymond Concrete Pile Co., 141 Md. 67, 85, 86.

In this latter event, the claim of the Floyd Company against the Ohio corporation may properly be set off against the claim of the Maryland corporation against the Floyd Company.

In The Joseph R. Foard Company vs. State (C. C. A. 4th Circuit, 1914), 219 Federal 829, the Foard Company was held liable by the Admiralty Court for the negligence of the General Stevedoring Company, because the latter company, although a separate corporation, was found to be in reality but a department of the business of the Foard Company as ship brokers and agents. "The two companies had the same officers; the Stevedoring Company handled no funds, except through the Foard Company; its losses were paid by the Foard Company and dealt with as if they were the company's own losses; all of the profits of the Stevedoring Company were kept by the Foard Company as a charge for managing the business." The Court held that these circumstances were "sufficient to show that the Stevedoring Company was organized and controlled and its affairs so conducted as to make it a mere instrumentality of the Foard Company. This being so, the two corporations must be regarded, as to the outside public, identical." See also The William Van Drial, Sr. (C. C. A. 4th Circuit, May, 1918) 252 Federal Reporter 35, also an admiralty case..

In Baltimore Transit Company vs. Swindell, 132 Md. 274, Mr. Thom, the general attorney and a vice-president of the United Railways and Electric Company, testified that there was a close affiliation between the Railways Company and the Transit Company, that whatever percentage of the stock of the Transit Company was held by the Railways Company, or by friendly and allied interests, whatever the holding may actually be, for all practical purposes the control for operating purposes was in the United Railways and Electric Company. The two companies did not have the same officers, but the Transit Company got the benefit of any transportation knowledge or experience that it wished from the Railways Company (Record, Vol. 132 Md. Rep., Part IV, pp. 140 and fol.). This

and similar testimony was held sufficient to authorize the jury to find therefrom "that the Baltimore Transit Company was controlled in its operations by the United Railways and Electric Company" (132 Md., at p. 278), particularly as no special exception had been taken to the prayer which thus instructed the jury.

In Bethlehem Steel Co. vs. Raymond Concrete Pile Co., supra, the action had been brought against the Steel Company by the Pile Company for the use of its insurer and the widow and children of its deceased employee. The latter had been killed, while in the employment of the Pile Company, as the result of the negligence of the Patapsco and Back River Railroad Company. Compensation having been awarded against the Pile Company, this subrogation action was brought against the Steel Company under Section 58 of Article 101 of the Annotated Code. The jury was instructed that "all that was necessary to hold the Steel Company (instead of the Railroad Company), was to find that the train (which killed the deceased), was being operated by persons in its employ," etc. This instruction was held to be erroneous because it "might easily have led them to believe that there could be a recovery if the Steel Company had control of the Railroad Company as owner of the stock, and could, for that reason, be said to be in control of the train when the accident happened. That is going beyond what the authorities justify" (141 Md. at p. 78).

The capital stock of the Railroad Company, with the exception of a few shares, given to or held by the directors for the purpose of qualifying them was in the name of the Steel Company. The Steel Company owned all of the land upon which the sixty miles of railroad track had been built. Most, if not all, of it had originally been built by the Steel Company, but when the Railroad Company was incorporated, the tracks, etc., were turned over to the Railroad Company, and the right of way was leased by the Steel Company to the Railroad Company. The railroad was connected with the Pennsylvania, Western Maryland and Baltimore and Ohio railroads. It had tariffs, etc., issued under the authority of the Interstate Commerce Commission, and the Public Service Commission of Maryland. Its locomotives were marked "P. & B. R. R." It had officers of its own. Its cashier was also cashier of the Steel Company, but its superintendent was not employed by the Steel Company. It actually served people other than the Steel Company. It had separate offices, paid its employees out of its own funds and its accounts were kept separately. It had separate pay rolls and checks of the Railroad Company were sent to the cashier (also of the Steel Company). It had a separate building at Sparrow's Point and it was a separate organization, although primarily organized for the benefit of the Steel Company.

"When there is fraud, or some good ground for its action, in furtherance of the ends of justice, it is true that a Court has the power to go behind the legal entity and treat the corporation and the owners of the capital stock and assets as identical" (p. 81).

This state of the testimony, it was held, required the submission to the jury of the question of whether the Railroad Company "was merely an instrumentality or adjunct of the Steel Company, or something to that effect." If to this question an affirmative answer be given by the jury, the Steel Company should be held liable. A negative reply would require its exoneration.

It will be noted that in the cases just discussed, the obligation of the subsidiary company was sought to be enforced as against the parent company. The attempt is to hold the latter, as stockholders, and in control, of the former, as being the former in legal effect. In the case now before the Court, a different situation is presented. Here, the attempt is to hold liable the subsidiary corporation for the debt of the principal corporation on the ground that the latter controls the stock, and the conduct of the business, of the subsidiary. The agent, merely as agent, may not be held liable for the debts of his principal, in the creation of which he has not personally participated, although, of course, the principal is responsible for the obligations of the agent contracted on behalf of the principal within the scope of his actual or apparent authority. Where the parent company is sought to be held liable for the debts of the subsidiary, that result may oc-

cur as a result of the agency of the subsidiary or of the legal identity of the two companies. Where, however, as here, the subsidiary is to be made responsible for the debts of the principal, that may happen only as a consequence of the legal unity of the two. The agent, as such, may obviously not be held accountable for an obligation incurred by his principal alone, and to which he was not a party. If any liability exists at all, it must be because the parent in assuming the obligation did so as the *alter ego* of the subsidiary.

The only case to which I have been referred in which this situation existed is Gay vs. Hudson River Electric Power Co., 187 Fed. 12. This is a decision of the Circuit Court of Appeals for the Second Circuit made on April 21, 1911. This case in some respects is strikingly like the case at Bar. It involved the right of a creditor of the principal corporation to set off its claim against its debt to the subsidiary. Its facts are quite involved, but the following is a sufficient statement for our purposes.

Eight corporations were associated, of which one was the managing and controlling company. Some of these corporations generated electricity, and others transmitted it. Some sold electrical power and others used it in various ways. Still others delivered and sold electric light. Practically, there was one enterprise, with different departments. The business of all the corporations was transacted through the managing company. All receipts were deposited to its credit, although bookkeeping entries were made crediting them to different companies. So the several corporations were charged on the books with disbursements made by the managing company for their respective accounts.

The managing corporation was the Hudson River Electric Power Company, and the subsidiary corporation under consideration in this case was the Hudson River Electric Company. The latter corporation was a distributing company, and it never owned any station for the generation of electrical power.

The Hudson River Electric Company with two other subsidiary companies entered into a contract with the General Electric Company under which

they agreed to furnish power to that corporation. Payment therefor was to be made to the Hudson River Electric Company. Under this agreement electrical power amounting to upwards of $200,000 was furnished to the General Electric Company. This was never paid for, except by way of set-off, now to be referred to.

The General Electric Company sold to the managing company—the Hudson Electric Power Company—merchandise to an amount approximating the amount which it owed for the power purchased. A portion of this merchandise was used for the benefit of the Hudson River Electric Company.

Apparently, prior to April 28, 1928, there was no express agreement that the General Electric Company should offset the debt of the managing company for merchandise purchased against the amount which it owed to the subsidiary corporation for power supplied, although the methods of doing business, the relations of the corporations, and the course of dealing were such as to lead the General Electric Company reasonably to believe that it was dealing with the different corporations as a single enterprise, and that such set-off would be allowed. On April 28, 1908, an express agreement to that effect was entered into and the offsets were duly made upon the books of the different corporations. This settlement was approved by the Circuit Court and from this approval this appeal was taken.

The Court quoted from the opinion in the case of the Matter of Watertown Paper Co., 169 Fed. 252, holding that the separate corporate entities would be recognized except only (1) when necessary to circumvent fraud. (2) Where a corporation is so organized and controlled and its affairs are so conducted as to make it merely an adjunct or instrumentality of another corporation.

It then went on to say: "There would be much ground for holding that the Hudson River Electric Company comes within the second exception to the rule of distinct corporate existence. The record clearly indicates that it was organized and controlled as a subsidiary corporation, and that its affairs were so conducted as to make it, practically, an adjunct of the managing

corporation—the Hudson River Electric Power Company. It would seem that we would not be departing from established principles if we should regard this book credit of the Hudson River Company as really existing in favor of the managing corporation, the Electric Power Company, against which, without special agreement, this demand against the managing corporation might properly be offset. It would be equitable so to hold. The Hudson Electric Company did not generate the power which it sold. It obtained it only through the bookkeeping of the managing company from another subsidiary corporation. The managing corporation did not use the merchandise which it bought. It distributed it among the various subsidiary companies. The offset could hardly be regarded as unfair to the Hudson River Electric Company, while it would be grossly unfair to the General Electric Company to compel it to pay its indebtedness to one of the companies and to look to an insolvent associate for the payment of its own account.

"But it is unnecessary to decide this case upon the ground just considered, and we distinctly refrain from so doing. As we have seen, the Hudson River Electric Company expressly agreed that the accounts in question should be offset, and with an agreement to that effect in the case, we are not obliged to determine the rights of the parties with it out."

It will be noted that the Federal Court is very careful to state that it actually decides that the right of set-off in this case grows out of the agreement and does not arise under the second exception, although it expresses the opinion that much ground exists for so holding.

It is clear on these authorities and others, which were cited and have been considered, that, in the instant case, the Court might not properly rule as a matter of law that its verdict as a jury should be for the defendants. No instruction to that effect was requested. Indeed, no prayers for instructions were asked for by either side. No question of law is, therefore, presented to the Court for consideration. The discussion herein is had merely for the purpose of enabling the Court to get the benefit of judicial consideration of the questions involved. In the ad-

miralty and equity cases, the Court passed on the evidence as well as upon the law, and the conclusions there reached would have a persuasive effect upon the Court sitting as jury.

I am not herein instructing myself, as jury, as to the law. My verdict is solely as to the facts on the evidence. I find as facts that the Maryland and Ohio corporations have been maintained as distinct and separate legal entities, with independent systems of accounts, officers and employees. No fraud is permitted as a consequence of such holding. The Ohio corporation is amply and completely able to answer for its obligations to the plaintiffs. It is true that some inconvenience and expense of proceeding against it in the State of Ohio may follow. If any of its assets can be found within this State, even this inconvenience and expense may be obviated by the issuance of a non-resident attachment. In the course of business, the Maryland corporation would naturally owe the Ohio corporation money, which would be subject to garnishment in this State. Certainly these facts alone would not justify the refusal to recognize the corporate existence of the Maryland corporation. It is true that the relationship of the Maryland and Ohio corporations is close, even intimate, that the Ohio corporation owns a majority of the capital stock of the Maryland corporation and holds the remainder thereof as collateral security for its loan to Sweeney. The Maryland corporation may be fairly held to be a subsidiary of the Ohio corporation. These facts do not make the Maryland company any the less a separate corporation, "because the requirements of the general corporation law, under which the company was formed, were substantially complied with." I find no fraud, that the Maryland corporation was not solely an adjunct or instrumentality of the Ohio corporation, and no good ground, in furtherance of the ends of justice, for disregarding the legal entity and treating the two corporations as identical. Steel Co. vs. Concrete Co., 141 Md., at p. 81. In all of the cases above cited, where the Court on the facts held the principal and subsidiary a unity, the extent of the control exercised by the former over the latter greatly exceeded that to be found in the instant case. As jury, the Court is not unmindful of

the economic and social value of the formation and maintenance of subsidiary companies for special purposes, without exposing the parent organization to unlimited liability. (See paper of Horace T. Smith, of the Baltimore Bar, entitled "The Effect of Sole Stock Ownership and Control Upon the Status of Stockholders in Maryland," Daily Record, October 9, 1928)." An effective check upon the abuse of the right to maintain the two organizations as separate entities will be found in the limitations above discussed.

The control by the parent of the capital stock of the subsidiary is not of itself sufficient to destroy the corporate separation. (141 Md., at p. 78). Obviously, such stock ownership carries with it the power at any time to break down the distinct organizations and to make the principal, not merely potentially but actually, the dominating force in the operation of the subsidiary. When that actually occurs, the obligations of each may become the liabilities of the other. In the pending case, it has been, and is now, within the power of the Ohio corporation to operate the Maryland corporation as its mere instrumentality or adjunct. There is no presumption of law or of fact that it has done so. The burden of so proving, resting upon the defendants, has not been met.

My verdict is for the plaintiff in the sum of $2,621.29.