## WILLIAM E. DIXON ET AL. *v.* THE PROCESS CORPORATION ET AL.

[No. 585, September Term, 1977.]

*Decided February 10, 1978.*

p. 660

The cause was argued before GILBERT, C. J., and DAVIDSON and COUCH, JJ.

*William L. Corbin,* with whom were *B. Craig Wald* and *Corbin, Heller & Warfield, Chartered* on the brief, for appellants.

*Bayard Z. Hochberg* for appellee, The Process Corporation.

GILBERT, C. J., delivered the opinion of the Court.

A commercial corporation is a legal entity conceived by the mind of man and legitimated by statute for the avowed purpose of achieving a maximum profit with a minimum exposure to liability.[1] When such an entity is the parent of multiple offspring in the form of subsidiary corporations, woe unto the creditor who seeks to rip away the corporate facade in order to recover from one sibling of the corporate family

---

[1] According to W. Blackstone, *Commentaries on the Laws of England* *468-469 (1898), "The honor of originally inventing" the corporate concept falls to the Romans. The first corporations *(corpora, corporata)* were bodies politic consisting of "separate societies of every manual trade and profession. They were afterwards much considered by the civil law." *Id.* For an interesting history of corporations *see McKim v. Odom,* 3 Bland 407, 415-20 (1828).

what is due from another in the belief that the relationship is inseparable, if not insufferable, for his is a herculean task.

In the matter now before us, William E. Dixon and Ernest J. Litty failed in their bid in the Circuit Court for Prince George's County to have that court decree that the property and assets of the appellee, The Process Corporation (TPC), were those of Process Incorporated of Maryland (PIM), so that a judgment lien against the latter would be collectable from the former. The appellants also met with an utter lack of success in their efforts to impress a trust upon the property of TPC in favor of the now defunct PIM.[2]

Refusing to accept what to some may have appeared "to be inevitable defeat,"[3] and in an effort to salvage their investment, the appellants vigorously assert in this Court that Chancellor William B. Bowie erred in dismissing the amended bill of complaint at the close of the plaintiffs'-appellants' evidence.[4] Just as strenuously, TPC asseverates that Judge Bowie was correct in taking the action that he did.

Our review of the record leads us to conclude that TPC has the better of it, and we shall affirm the dismissal of the bill. We now explain why we have reached that conclusion.

## THE FACTS

The scenario from which this appeal arises is intricate, ofttimes confusing and, yet, probably typical of many present-day land developments.

TPC was initially created as an independent body but later became one of eleven (11) known subsidiaries of the parent corporation, PIM.[5] The objective of PIM was land

---

2. PIM did not file a brief in this proceeding. We observe from the record that the corporate charter of PIM was forfeited by proclamation on December 20, 1976. *See* Md. Corp. & Ass'ns. Code Ann. § 3-503.

3. George C. Marshall (1880-1959), *Biennial Report of the Chief of Staff, United States Army,* September 1, 1945.

4. Appellants apparently find no solace in John Kenneth Galbraith's (1908-     ), *The Great Crash,* 1929, ch. 1 (1955), that "nothing is . . . lost but money."

5. The other subsidiary corporations were Development Process, Inc.; Resident Planned Communities, Inc.; Development Exchange, Inc.; Frederick

development in various counties of Maryland. The subsidiaries came into being with the view in mind of limiting liability to the particular corporation given life for the purpose of developing a specified tract of land. PIM conducted the management affairs of all its subsidiaries, owned the equipment they used, hired their employees, paid their office rents, and operated the payrolls and unemployment matters. PIM then charged to each subsidiary the expenses PIM incurred on their behalf. The directors were the same for all corporations, and at board meetings, any matters of the various corporations were discussed. Minutes were kept and an undocumented set of bylaws, uniform as to all the corporations, was adopted. The stock of PIM was paid for but not issued "because of the neglect of the secretary." Articles of incorporation for both PIM and TPC were filed with the State Department of Assessments and Taxation.

In early 1972, John Healey, a law partner of Thomas A. Garland, and a friend and former employee of the appellant, William E. Dixon, contacted Dixon to solicit his investment in a proposed development in Prince George's County known as Clinton Woods. Dixon, an attorney with extensive experience in land development and real property law, was also chairman of the board and two-thirds stock owner of The Monumental Title Company (MTC). Dixon reviewed the plat, the purchase contract, and the construction estimates. Although Dixon was "not too much interested in who ... [Clinton Woods] was titled to," the purchase agreement and option revealed that the contract was between TPC and the Ryland Group Incorporated. Dixon declined to invest in the Clinton Woods project.

Sometime in late November or early December of 1972, Healey once again contacted Dixon. The contact concerned the acquisition and development of a large tract of land located in Charles County and known as Maxwell Hall. Healey needed $150,000 by the end of December to purchase, engineer, and rezone a 384 acre parcel known as the Chaney

Process, Inc.; Harford Process, Inc.; Community Dev. & Const. Corp.; Phase One, Limited; Phase Two, Limited; Tricore Corporation and Process Incorporated of Columbia.

tract, which comprised but a portion of Maxwell Hall. Dixon was interested in the venture and contacted his friend,[6] the appellant, Litty, who had previously financed a real estate development undertaking. Litty, the owner of the Leimbach Construction Corporation, agreed to participate and to finance the venture from surplus corporate funds so that he could convert ordinary income into capital gains and thus avail Leimbach of a tax advantange. In furtherance of the venture, Dixon and Litty formed a partnership known as Benedict Associates, whose goal was to conduct the transaction and to divide the profits "50-50."

Under the relevant terms of the transaction, the Chaney tract was to be purchased by Garland (the president of PIM and TPC) acting individually as trustee [7] for the partnership of Benedict Associates. PIM agreed to repurchase the Chaney tract from the partnership within one year.

A meeting was held at the offices of PIM in Columbia, Maryland in order to discuss the development, financial details, and to close the deal. Dixon, worried that the funds to repurchase the Chaney tract would not be available within the one year period, testified that he was reassured by Garland that "[w]e own the [Clinton Woods] property," and that it would generate the cash necessary to repurchase the Chaney land from the partners. According to Dixon, throughout the complex negotiations and discussions of the various development projects under way, everything was referred to as being the projects of "Process." Dixon and Litty both told Judge Bowie that they believed one corporation, "Process," was the owner and developer of all the real estate projects. They said that it was never explained to them, and they did not ask whether the corporation they were dealing with, PIM, held title to the Clinton Woods property. Without further investigation or ascertaining who held title to Clinton Woods, the appellants agreed to loan PIM the $150,000.

---

6. Had Mr. Litty been mindful of the words of Jane Austen (1775-1817) in *Emma,* ch. 34 (1815) that "[b]usiness . . . may bring money, but friendship hardly ever does," he may not have become an appellant in this ligitation.

7. By so doing, the parties sought to avoid the payment of transfer tax more than once.

Execution of the Benedict Associates partnership agreement, as well as the loan agreement, including a repurchase option in PIM was on December 27, 1972. PIM, through Garland as president, signed two confessed judgment notes in favor of appellants of $35,000 and $25,000 respectively. The option-loan agreement clearly shows that the transaction was between Dixon and Litty trading as Benedict Associates and PIM. Litty told the court that he did not bother to read the papers, and that he entered into the transaction, trusting in the expertise of his friend and partner, Dixon.

A letter dated December 14, 1973, and bearing the letterhead, "Process, Incorporated," was received by Messrs. Litty and Dixon. The content advised the appellants that "Process Incorporated of Maryland [PIM] exercises its option to purchase the partnership interests . . . [the Chaney tract]." Apparently, because of a lack of funds, the repurchase did not materialize. PIM, however, in consideration of a promissory note in the amount of $50,000 payable to Dixon and Litty, executed by Garland as president of PIM, obtained a ninety (90) day extension of the December 27, 1972 agreement. Nevertheless, the repurchase was never consummated because of PIM's fiscal embarrassment, nor were the notes paid.

Appellants exercised the powers contained in the notes and obtained confessed judgments in the Circuit Court for Charles County against PIM in the amounts of $28,722.83, $40,213.05, and $56,186.17, respectively.[8] The original judgments were certified to Prince George's County and entered of record. Following hearings on motions to vacate, the judgments, including accrued interest, were again certified to Prince George's County and again entered of record as an integral part of appellants' design to establish that Clinton Woods was actually an asset of PIM.

8. The judgments were for the face amount of the notes plus interest. A motion to vacate was filed as to each of the judgments. After a hearing, the court entered a judgment absolute on the $25,000 note for $31,350 and on the $50,000 note for $61,416.64, which included interest to September 30, 1975. The court, on April 4, 1975, had overruled the motion to vacate as to the $40,213.05 judgment.

Dixon related to Judge Bowie that in the latter part of 1974 or early 1975, he conducted a title search wherein he discovered, much to his dismay, that title to Clinton Woods was held by TPC and not PIM. A telephone call to Healey and independent verification by counsel confirmed the existence of PIM and TPC as two separate corporate beings. Meanwhile, MTC, of which Dixon is chairman of the board, conducted settlements on various lots at Clinton Woods. Those settlements, which were preceded by a title search, revealed that TPC held the deed to Clinton Woods. Notwithstanding the settlement's being conducted by MTC, Dixon disclaimed any knowledge of TPC's ownership of the Clinton Woods property. MTC's title abstracters apparently did not show the judgments against PIM as a lien on the TPC property until Dixon directed them to do so. Dixon then undertook to withhold money due TPC and to place it in escrow pending a determination of the true ownership of Clinton Woods. Dixon's withholding of the funds led to an argument with Garland as president of TPC over whether TPC and PIM were one and the same.

The encounter spilled over into the circuit court. There appellants charged that Garland, an officer, director, and stockholder [9] of PIM and TPC fraudulently misrepresented that PIM had "record title" to the Clinton Woods property and that appellants relied on this assertion to their detriment as title was actually held by the subsidiary corporation, TPC. The bill urged that the separate corporate identities of PIM and TPC be disregarded, that the judgment lien against PIM also be imposed on the property of TPC, and, as we have previously stated, that a trust be impressed upon the property and assets of TPC in favor of PIM.[10]

---

9. The 1972 federal corporation income tax return of PIM indicated that it owned 100% of TPC. When stock was finally issued in TPC in December 1975, after suit was filed, it was issued to Garland and another individual and not to PIM as originally intended because PIM "was no longer functional." By the time of the trial in May 1977, Garland had allegedly gone into bankruptcy.

10. At the trial of the case, Dixon admitted that Garland's trustee in bankruptcy had conveyed the 384 acre Chaney tract to Dixon and Litty trading as Benedict Associates.

Judge Bowie made it unmistakable that Dixon's testimony that he assumed the difference in the names TPC and PIM in the title search "was a typographical error" was "incredulous."

## I

Appellants aver that "Garland was the principal, the promoter, the dominating individual in both ... [PIM and TPC]. The corporations were his alter ego." [11] *Ergo,* appellants urge that Garland's domination of the corporations for his personal ends, without regard to their separate corporate identities should not shield TPC from liability in equity for the actions of PIM. That argument is better tailored to fix individual liability upon Garland rather than to hold PIM and TPC liable for representing and acquiescing to the false representation that PIM owned and operated the Clinton Woods property when in fact it was an asset of the subsidiary TPC.

The Court of Appeals has indicated that in an appropriate case it will hold liable in equity the "alleged chief actor" of the perpetration of a fraud "accomplished through the medium of a corporate fiction" where the principal actor "is asserted to have dominated and controlled the intervening corporate entities and, through that domination and control, to have accomplished his personal ends and enterprises." *Crocker v. Pitti,* 179 Md. 52, 58, 16 A. 2d 875, 877 (1940). *See also William Danzer & Co. v. W. Maryland Ry.,* 164 Md. 448, 457, 165 A. 463, 466-67 (1933). *Crocker* is inapposite for at least three reasons: One, Judge Bowie stated he "felt that there was not one iota of fraud in the case"; two, it is patent that the chancellor did not believe that appellants relied upon any misrepresentation by Garland that PIM owned Clinton

---

11. The role of the lawyer and his relationship to a business corporation is colorfully stated by Roy A. Redfield in *Factors of Growth in a Law Practice* 30 (1962):

> "When the business corporation is born, the lawyer is the midwife who brings it into existence; while it functions he is its philosopher, guide and friend; in trouble he is its champion, and when the end comes and the last sad rites must be performed, the lawyer becomes the undertaker who disincorporates it and makes final report to the Director of Internal Revenue."

Woods; three, assuming, *arguendo,* the truth of appellants' claim that they were ignorant of the existence of TPC, that TPC was a subsidiary of PIM and that TPC owned Clinton Woods, then TPC could not be a conduit through which appellants and PIM dealt. Under appellants' own argument, TPC was neither the "alleged chief actor" in the purported perpetration of a fraud, nor was TPC an intervening corporate entity on whom they reasonably relied to their detriment in contracting with PIM.

The Court, in *Bethlehem Steel Co. v. Raymond Concrete Pile Co.,* 141 Md. 67, 118 A. 279 (1922), believed the "instrumentality rule" was applicable. That case involved an action against Bethlehem Steel to recover for the death of an employee caused by the negligent operation of a train owned by a railroad company which was controlled by and almost exclusively owned by Bethlehem.

On appeal, the Court ruled that the trial judge's grant of appellee's prayer that recovery could be had against Bethlehem if the deceased was killed by a train being operated "by persons in the employ of or subject to the control of" Bethlehem was erroneous. The error was caused by the trial judge's reference to the word "control" which might have led the jury to believe that control could be established simply through ownership of the railroad's stock. After an examination of the "instrumentality rule," the Court said that in order to hold the steel company liable the jury should "be required to find that the railroad company was merely an instrumentality or adjunct of the steel company, or something to that effect. . . ." 141 Md. at 86, 118 A. at 285.

Unfortunately, the "instrumentality rule," [12] as with many other guiding legal principles, is not given to a hard and fast

---

**12.** While it is not clear from the case, the "instrumentality rule" may have been used without designation as such by the Court of Appeals in United Laundries Co. v. Bradford, 133 Md. 363, 368, 105 A. 303, 305 (1918), where the Court, in reviewing the legal sufficiency of the evidence to support a jury's verdict against a defendant corporation, said that the trial judge properly rejected a directed verdict "in favor of ... the defendant ... [corporation] which controlled and conducted, through the other defendant ..., the business in the course of the operation of which the accident to the plaintiff occurred." *See also* Baltimore Transit Co. v. Swindell, 132 Md. 274, 278, 103 A. 566, 567 (1918); Annot., 38 A.L.R.3d 1102 (1971).

definition. It has, however, been summarized in 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 43 (rev. perm. ed. 1974). There it is said:

> "[T]he corporate entity is disregarded ... wherein it is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation. The control necessary to invoke what is sometimes called the 'instrumentality rule' is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." (Footnotes omitted.)

That the parent corporation owns the subsidiary, *Bethlehem Steel Co. v. Raymond Concrete Pile Co., supra* at 81, 118 A. at 284, or the stock is held by one person, does not justify a disregard of the corporate entity. *Carozza v. Fed. Fin. & Credit Co.,* 149 Md. 223, 238, 131 A. 332, 338 (1925); *Quinn v. Quinn,* 11 Md. App. 638, 648, 276 A. 2d 425, 430 (1971).

Courts have considered various alternative factors in determining whether the subsidiary constitutes a mere instrumentality of the parent corporation. Some of those alternatives are expressed in Annot., 7 A.L.R.3d 1343, 1355 (1966):

> "(1) the presence in both corporations of the same officers or directors; (2) common shareholders; (3) financial support of the subsidiary's operations by the parent; (4) underwriting the incorporation and purchase of all of the capital stock of the subsidiary by the parent corporation; (5) the fact that the subsidiary was organized with a grossly inadequate capital structure; (6) a joint accounting and payroll system; (7) the subsidiary lacks substantial business contacts with any save the parent and operates solely with assets conveyed by the parent corporation; (8) in the financial statements of the

parent, the subsidiary is referred to as a division of the parent corporation or obligations are assumed to be those of the parent; (9) the property of the subsidiary is used by the parent corporation as its own; (10) the individuals who exercise operating control over the subsidiary exercise it in the interest of the parent; and (11) failure to observe the formal requirements attributable to the operation of a subsidiary."

*See also* H. Henn, *Law of Corporations* § 148 (2d ed. 1970).

Garland, the president and a director of both PIM and TPC, testified that the directors for the corporations were the same, the stock of PIM was paid for but not issued, PIM owned all the equipment used by its subsidiaries, hired their employees, rented their offices, operated their payrolls and unemployment matters, and managed their affairs. At meetings of the boards of directors, inferentially, of PIM, the business matters of the various corporations were discussed. Separate board meetings for TPC were not held.

Dixon and Litty testified that Garland asserted that the Clinton Woods property was owned by "Process," without specifying that he was referring to the subsidiary TPC, of whose very existence appellants claimed total ignorance at the time of the December 1972 agreement. We think there was legally sufficient evidence to cast doubt as to the separate corporate identities of PIM and TPC.

## II

Appellants' invocation of the "instrumentality rule" nevertheless, avails them naught as Maryland law is crystalline "that the corporate entity will be disregarded only when necessary to prevent fraud or to enforce a paramount equity." *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.,* 275 Md. 295, 312, 340 A. 2d 225, 235 (1975). *See Damazo v. Wahby,* 259 Md. 627, 633, 270 A.2d 814, 817 (1970); *William Danzer & Co. v. W. Maryland Ry., supra* at 457, 165 A. at 467; *Carozza v. Fed. Fin. & Credit Co., supra* at 238, 131 A. at 338; *Bethlehem Steel Co. v. Raymond Concrete Pile Co., supra* at 81, 118 A. at 284; *Quinn v. Quinn, supra* at 648, 276 A. 2d at

430. In *Bart Arconti,* the Court, absent evidence of fraud or similar conduct, refused to "pierce the corporate veil" so as to hold liable, in addition to Arconti, the principals of that company, and two other corporations controlled by the same principals. Even though all three corporations had commingled their equipment, operated out of one place of business belonging to Arconti, permitted Arconti to become dormant while the affairs of the other two corporations improved simultaneously, made personal loans to the principals and transferred insurance policies to them. 275 Md. at 309, 340 A. 2d at 233-34, Judge Levine, writing for the Court, pointed out that there was no finding of fraud or paramount equity and that it was error to go behind the corporate fiction absent such a finding.

Similarly, Chief Judge Northrop, in *Gordon v. SS Vedalin,* 346 F. Supp. 1178, 1181 (D. Md. 1972), applying the Maryland rule, refused to slash through the corporate screen and hold a shareholder liable, in the absence of fraud or the necessity of protecting a paramount equity, for the corporation's obligation to purchase a vessel. Judge Northrop noted that "there was significant doubt from the evidence that the legal niceties of corporate existence, such as the formal issuance of stock and corporate meetings, were regularly, if ever, observed," but filing of the articles of incorporation with the State Department of Assessments and Taxation satisfactorily established the existence of the corporation as a separate entity.[13]

Judge Bowie expressly found that there was no fraud and that no paramount equity was present in the case *sub judice* which required the intervention of equity's awesome powers. We are unable to say that his findings on the evidence were clearly erroneous. Md. Rule 1086. We perceive, in the record, no justification for the disregard of corporate identity. *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc., supra.*

### III

Appellants maintain that "the court erred in granting the

13. *See* Md. Corp. & Ass'ns. Code Ann. §§ 1-205 and 2-102 (b). At the trial of the instant case, certified copies of the corporate charters of PIM and TPC were produced and proved their corporate existence.

motion to dismiss" because it applied "the wrong burden of proof to the evidence." Appellants take issue with the trial judge's requiring that they demonstrate by "clear and satisfactory" proof that there was a fraud, rather than allowing them to show fraud by a preponderance of the evidence. Judge Bowie did not err. This Court, after a thorough study of the cases on point, *Peurifoy v. Congressional Motors, Inc.,* 254 Md. 501, 517, 255 A. 2d 332, 340 (1969); *Bachrach v. Washington United Coop., Inc.,* 181 Md. 315, 321, 29 A. 2d 822, 825-26 (1943); *Rent-A-Car Co. v. Globe & Rutgers Ins. Co.,* 161 Md. 249, 267-68, 156 A. 847, 855 (1931), concluded in *Loyola Fed. Sav. & Loan Ass'n v. Trenchcraft, Inc.,* 17 Md. App. 646, 659, 303 A. 2d 432, 439 (1973), that the law of Maryland mandates that "proof of fraud in a civil action, either in law or in equity, must be 'clear and convincing.' " *See also First Nat'l Bank of S. Maryland v. United States Fidelity and Guar. Co., 275 Md. 400, 411, 340 A. 2d 275, 283 (1975);* Garris v. Dickey, 22 Md. App. 618, 630, 325 A. 2d 156, 164 (1974); *Goodman v. Poland,* 395 F. Supp. 660, 686, n. 17 (D. Md. 1975).

Appellants have not persuaded us that we were wrong in *Loyola,* and we reject their urging to overrule that case and establish a lesser burden of proof where fraud is alleged.

## IV

We make clear that the rule of law in this State is that no matter how flimsily woven is the corporate curtain, it may not be flung aside except to prevent fraud or enforce a paramount equity. *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc., supra.*

While not alleged in the bill nor pressed at trial, appellants advance the contention that the evidence had shown that a constructive fraud had been perpetrated upon them. Appellants asserted in this Court that the evidence viewed, as must be in the posture of the case before Judge Bowie, Md. Rule 535, in the light most favorable to them, exhibited fraud, either actual or constructive. What appellants overlook is that they elected to call Garland as an adverse witness pursuant to Md. Cts. & Jud. Proc. Code Ann. § 9-113, and his testimony

completely eroded that of the appellants. Garland's testimony was not contradicted nor impeached, and, hence, it was binding upon the appellants. *Gross v. J & L Camping & Sports Center, Inc.,* 270 Md. 539, 548-49, 312 A. 2d 270, 276 (1973); *McClearn v. Southeast Concrete Co.,* 253 Md. 135, 137-38, 251 A. 2d 896, 898 (1969); *Nizer v. Phelps,* 252 Md. 185, 203-04, 249 A. 2d 112, 122-23 (1969).

Appellants imply that the chancellor did not consider their argument relative to constructive fraud and estoppel. We think that implication to be ill founded. Judge Bowie made manifest in his oral opinion that "no fraud" was shown by appellants, and that he had not "seen anywhere in the evidence, anything to justify the [c]ourt [in] declaring a paramount equity in their behalf. . . ."

Appellants seem to be advocating a rule of law which would permit relief in constructive fraud or estoppel cases upon the production of evidence amounting in quantum to a preponderance of the evidence.

We fail to see why constructive fraud should require a lesser degree of proof than actual fraud because allegations of either seek the same end result. Indeed, if the former could be proved by a lesser standard than the latter, it would seem that the overwhelming majority of cases in which a form of fraud is alleged would be brought on the theory of constructive fraud so as to minimize the burden carried by the alleger. *See generally* 37 Am. Jur. 2d *Fraud and Deceit* § 469 (1968); 37 C.J.S. *Fraud* §§ 94, 114a (1943).

Judge Bowie, as we have previously stated, found that the appellants had shown "no fraud." We interpret that unqualified finding to include "constructive" as well as "actual" fraud. There being no clear and convincing proof of either type of fraud, the appellants failed to meet the burden of proof.

Interwoven with appellants' argument relative to constructive fraud is the averment that the appellee is estopped from asserting as a defense the separateness or isolation of TPC from PIM because of Garland's supposed misrepresentations.

658

3 J. Pomeroy, *A Treatise on Equity Jurisprudence* § 804 (5th ed. 1941), defines equitable estoppel as "the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who, on his part, acquires some corresponding right, either of property, of contract,. or of remedy." (Footnote omitted.). *See Pearre v. Grossnickle,* 139 Md. 1, 8-9, 114 A. 725, 728 (1921); *Rodgers v. John,* 131 Md. 455, 462, 102 A. 549, 551 (1917).

Whether the doctrine is to be applied in a given case is dependent solely upon the particular facts and circumstances of that case. *Rodgers v. John, supra* at 462, 102 A. at 551. Unless the party against whom the application of the doctrine is sought has been blameworthy "of some unconscientious, inequitable or fraudulent act of commission or omission upon which another has relied and been misled to his injury, the doctrine will not be applied." *Id; Pearre v. Grossnickle, supra* at 9, 114 A. at 728-29. *See also Savonis v. Burke,* 241 Md. 316, 319-20, 216 A. 2d 521, 523 (1966); Bayshore Indus., Inc. v. Ziats, 232 Md. 167, 176, 192 A. 2d 487, 492 (1963).

Judge Prescott (later Chief Judge), for the Court, in *J.F. Johnson Lumber Co. v. Magruder,* 218 Md. 440, 448, 147 A. 2d 208, 212 (1958), added, as a condition precedent to the availability of equitable estoppel, *reasonable diligence.* Where the one who claims the aid of the doctrine of estoppel has not acted with such diligence, equity will afford him no relief. *Savonis v. Burke, supra* at 320, 216 A. 2d at 523; *Rupp v. M.S. Johnston Co.,* 226 Md. 181, 190, 172 A. 2d 875, 880 (1961).

The two obvious answers to appellants' attempt to apply the doctrine of estoppel to the facts of the instant case are: 1) The trial judge, as finder of fact, did not believe on the basis of appellants' evidence that there was an "unconscientious, inequitable or fraudulent act of commission or omission" on the part of Garland which misled Dixon and Litty to their detriment. From review of the record, we are unable to

declare that Judge Bowie's findings, bottomed upon the evidence, were clearly erroneous. Md. Rule 1086. 2) Appellants failed to illustrate that they exercised *reasonable diligence* to protect themselves from what they perceive as the wrong about which they presently lament. In fact, the appellants may well have demonstrated their lack of diligence through the testimony of the appellant Dixon and Daniel Kammer, a vice-president of the Union Trust Company. The transcript reveals that in the early part of 1972, Dixon was approached by Healey and offered the opportunity to invest in Clinton Woods. The information supplied to Dixon by Healey disclosed that the contract for the development was between TPC and the Ryland Group, Inc. Dixon examined the contracts and declined to invest. Mr. Kammer testified that his bank did business with TPC and that a check made by the counsel for the bank at its request disclosed the existence of PIM and TPC as two different corporations. Moreover, an inference may be drawn from the evidence that MTC's "free lance" title abstracter considered PIM and TPC as two distinct corporations inasmuch as he did not list the appellants' judgment against PIM as being a lien on the TPC property known as Clinton Woods. Dixon, being a seasoned title expert and real property attorney, as well as a developer of land, could have easily and quickly ascertained the name of the titleholder to Clinton Woods. We think the chancellor correctly held that appellants had not demonstrated a paramount equity necessitating the scuttling of the barrier of corporate protection to satisfy the disillusioned creditors.

## V

Finally, appellants aver that TPC carried on business under other titles and designations, namely, "Process" and "Process, Incorporated," or "Process, Inc.," in violation of Md. Ann. Code art. 2, § 18. That statute requires "[a]ny person or persons, engaged in any mercantile, trading or manufacturing business as an agent or agents, or doing business in any name or under any title or designation other than his or their own names," to file a certificate with the clerk of the circuit court and with the Department of

Assessments and Taxation "disclosing the true and correct name or names . . . of the principal or principals or true owner or owners of the said business." Section 20 of the same article grants additional protection in cases of failure to file the certificate provided for in § 18, to "any person or corporation who shall become a creditor of such person or persons."

The manifest purpose of the quoted §§ 18 and 20 of Article 2, the Agents and Factors Act, is to protect creditors from the misleading machinations of persons engaged in "mercantile, trading or manufacturing business[es] . . . under . . . other than his or their own name or names. . . ." *See Mundon v. Taxicab Co.,* 151 Md. 449, 455, 135 A. 177, 180 (1926). As we see it, the word "person" as utilized in both §§ 18 and 20 reasonably includes "corporation." Md. Ann. Code art. 1, § 15. Neither section, however, affords appellants any support in the instant case inasmuch as the evidence does not establish an agency relationship between PIM and TPC. Moreover, none of the corporate entities, *see* n. 5, *supra,* is engaged in a "mercantile, trading or manufacturing business" within the ambit of Md. Ann. Code art. 2. The ostensible purpose of §§ 18 to 20 is to protect the rights of agents' creditors who finance the agents' purchase of inventory. *See In re Lexington Appliance Co.,* 202 F. Supp. 869, 871-72 (D. Md. 1962); Stiller, *Inventory and Accounts Receivable Financing: The Maryland Maze,* 18 Md. L. Rev. 185, 224-25 (1958).[14]

Appellants would have us impose upon all corporations with subsidiaries the additional duty of registering their corporate names pursuant to the "Agents and Factors Act." By so doing, we would add an elasticity to the language of the "Agents and Factors Act" that would permit its being stretched far beyond the purpose intended by the General Assembly. We decline to do so.

*Judgment affirmed.*
*Costs to be paid by appellants.*

---

14. Mr. Stiller observes that "[o]nly three other [S]tates, Virginia, West Virginia, and Mississippi, have similar laws, but the others, variously known as 'Trader's Acts' or 'Sign Statutes', substitute a sign on the agent's premises for the recording of the Maryland Act." 18 Md. L. Rev. at 225.