**GEO. BYERS SONS, INC.**

v.

**EAST EUROPE IMPORT EXPORT, INC.; John S. Connor, Inc. and Robert Ross.**

Civ. No. B-77-450.

United States District Court, D. Maryland.

Jan. 4, 1980.

Robert E. Tait and Vorys, Sater, Seymour & Pease, Columbus, Ohio, Luke Marbury and Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

Alan B. Lipson and Charles Tatelbaum, Baltimore, Md., for East Europe Import Export, Inc. and Robert Ross.

James R. White, Baltimore, Md., for John S. Connor, Inc.

## MEMORANDUM AND ORDER

C. STANLEY BLAIR, District Judge.

This action arises out of the unsuccessful attempt to introduce into this country the MZ motorcycle, manufactured in East Germany. Plaintiff and counter-defendant Geo. Byers Sons, Inc. ("Byers") was the exclusive distributor of the cycles in a seven-state area in the midwestern United States, by virtue of its contract with the importer, defendant and counter-plaintiff East Europe Import Export, Inc. ("East Europe"). Defendant and counter-plaintiff Robert Ross was the president of East Europe, and the party with whom Byers' representatives negotiated the contract for the motorcycles. Defendant John S. Connor, Inc. ("Connor") is the customs house broker through which Ross and East Europe, at the suggestion of Byers, imported the vehicles

into the United States through the Port of Baltimore, Maryland.[1]

Of the 1018 motorcycles purchased by Byers under the terms of the contract, 988 form the basis of this litigation.[2] It is that number of motorcycles which, according to Byers, was imported into this country in violation of 15 U.S.C. § 1397(a) and (b)(3), of the Traffic and Motor Vehicle Safety Act ("Act"). Byers claims that the motorcycles were rendered worthless by the absence of a certificate of compliance with the federal safety standards, and thus brings this action seeking damages under a multitude of contract and tort theories. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1332 and 1337.

The case was tried to this court on November 5, 6, and 7, 1979. The court has carefully considered the claims and defenses of the parties on all counts, and issues this memorandum in lieu of formal findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

*Background.*

Byers first learned of Robert Ross, East Europe, and the plan to import the East German motorcycles through promotional materials received in November of 1973. Those materials described the efforts of Ross and East Europe to establish trade with Communist nations, and extolled the virtues of their latest import, the MZ motorcycle. (Plaintiff's Exhibit No. 1).

In response to East Europe's solicitation, Byers sent two representatives to New York in December of 1973, where they met Robert Ross and Jerry Berenson of East Europe. The Byers people had no prior experience with motorcycles, but were part of a family corporation that had been engaged in the automobile business for three generations. In addition to Chrysler automobiles and GMC trucks, the Byers organization had handled a variety of foreign cars, including Simca, Subaru, Volvo, Jaguar, MG and Bricklin. In all past dealings

involving foreign automobiles, Byers had dealt with an importer, never importing any of the vehicles on its own. (Testimony of George Byers, Jr.).

The Byers people viewed samples of the motorcycles in New York, and continued negotiations with Ross and Berenson in Columbus early in 1974. Throughout the negotiations, Ross assured Byers that the brakes, exhaust systems and tires on the sample motorcycles complied with federal safety standards, but that the lights were not in compliance. He further stated that this problem had been solved by his purchase of Lucas lighting systems in Great Britain, and that future motorcycles would arrive equipped with suitable lights. (Testimony of George Byers, Jr., Robert Ross).

Ross presented to Byers a standard "Distributorship Agreement" (contract), to which he allowed any additions and amendments requested by the Byers people. Chief among those amendments was the inclusion of the following language in Paragraph 11: "The Company warrants that all motorcycles, parts and spare parts, etc., are in compliance with all Federal and State laws, statutes and regulations." With this warranty, the contract and a "Separate Agreement" were entered into on January 28, 1974 by Byers and East Europe. The Separate Agreement placed Byers' first order for 300 motorcycles, and obligated it to order an equal number of cycles each month thereafter. (Plaintiff's Exhibit No. 2; Testimony of George Byers, Jr. and Robert Ross).

In order to perform its duties as a distributor of the MZ motorcycle, Byers hired a sales manager to establish, for the first time, a separate motorcycle division of the company. After receiving 1018 motorcycles under the terms of the contract, Byers was notified of a price increase in August of 1974. At that point, Byers informed East Europe that it did not desire to purchase any more. (Plaintiff's Exhibits No. 5, 6; Testimony of Robert Byers).

---

1. Additional defendants were eliminated from the case by Memorandum and Order of January 5, 1979.

2. The remaining 30 are "off-road vehicles," and thus not subject to the Federal Motor Vehicle Safety Standards, 49 C.F.R. §§ 571 *et seq.*

Thereafter, Byers continued to market the motorcycles on hand through dealers within its area of distribution. Pursuant to a request from Berenson at East Europe, Byers sent a few of the motorcycles to Leyda Motors, Inc. in Wisconsin, a prospective distributor outside of that area. In March of 1975, Byers received from Leyda the first in a series of letters through which it learned of a problem in marketing motorcycles not affixed with "fork stickers" certifying their compliance with applicable federal safety standards. (Plaintiff's Exhibits No. 9–13; Testimony of Robert Byers).

Later in 1975, Byers discussed the certification problem with its attorneys. On advise of counsel, Byers ceased all advertising and sale of the motorcycles in August and September of 1975. In a letter dated October 24, 1975, demand was made on East Europe either to supply the required stickers, or accept return of the motorcycles and refund the contract price plus interest. (Testimony of Robert Byers and John Herzog; Plaintiff's Exhibit No. 14).

After seeking the assistance of the East German manufacturer, Byers turned the matter over to counsel, who renewed the demand for the certificates and stated, in the alternative, an intent to hold East Europe and Connor liable for any costs incurred in obtaining certification by other means. Byers then undertook to have the motorcycles inspected and tested, a process which concluded with their approval by the National Highway Traffic Safety Administration in October of 1976. (Plaintiff's Exhibits No. 15, 16, 24).

By this time, the 1974 motorcycles were three model years old, and an inspection revealed that they were not in any condition to be sold as new merchandise under full warranty. Moreover, Byers had by then dissolved its motorcycle sales division, and so decided that the proper disposition of its inventory would be by bulk sale. Ac-

cordingly, the remaining motorcycles were sold in bulk, as is, at the price of $175.00 each. (Testimony of Robert Byers, John Herzog).

Plaintiff then brought this action seeking damages from East Europe, Ross and Connors on various theories of contract, warranty and tort. Each of these claims, and the facts particular thereto, will be discussed in the remainder of this memorandum.

### I. Breach of Contract by East Europe.

Byers' first claim charges East Europe with breach of contract. At trial, there was evidence tending to show that the motorcycles delivered by East Europe failed to conform to the contract description in at least two respects.

■ The first of these is the source of all the unanticipated difficulties which frustrated Byers' efforts to develop a sales territory for the MZ motorcycles, as it had done so successfully with the Subaru automobile. (Testimony of Robert Byers). Paragraph 11 of the contract called for East Europe to supply motorcycles which were in compliance with all federal and state laws, statutes and regulations. (Plaintiff's Exhibit No. 2). East Europe was required [3] by 15 U.S.C. § 1403 to furnish Byers with a tag or label for each motorcycle certifying compliance with federal motor vehicle safety standards. Irrespective of whether in fact the cycles did so comply,[4] the failure to provide the certification labels was in and of itself a violation of federal law and a breach of the contract.

■ In addition, East Europe was required by Paragraph 5 of the contract, as well as the Separate Agreement, to deliver parts and spare parts within three months from the date of Byers' order. There was uncontroverted testimony from Robert Byers that only "crash parts" were timely provided, but not the tune-up parts which

3. As one importing the motorcycles for resale, East Europe fell within the definition of a "manufacturer" for purposes of § 1403. 15 U.S.C. § 1391(5).

4. There was testimony that even after the Lucas lighting systems were installed, the controls and displays on the motorcycles failed to meet federal safety standards.

were necessary to prepare the motorcycles for sale to consumers by Byers and its dealers.

The court therefore finds and concludes that East Europe was in breach of the contractual provisions calling for compliance with federal statutes and the timely delivery of parts to Byers. Judgment will accordingly be entered for plaintiff on Claim I.

## II. Breach of Express Warranty by East Europe.

■ On the same evidence which dictated its disposition of the breach of contract claim, the court finds that East Europe is liable to Byers for breach of an express warranty created by the contract.

An express warranty may be created by any "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Uniform Commercial Code, § 2–313. Paragraph 11 of the Distributorship Agreement created such a warranty that the motorcycles would comply with all federal and state laws, statutes and regulations. Without the certification stickers required by 15 U.S.C. § 1403, the vehicles failed to live up to that warranty. Accordingly, judgment on the breach of warranty claim will be entered for plaintiff.

## III. Breach of Implied Warranty by East Europe.

Byers also alleges the existence and breach of an implied warranty of merchantability under § 2–314 of the Uniform Commercial Code. Such a warranty requires that goods sold by one who "is a merchant with respect to goods of that kind" be "merchantable," as further defined in that section.

■ It is uncontroverted that East Europe held itself out as, and was in fact, a merchant engaged in the importation and sale of foreign products. (Plaintiff's Exhibit No. 1). With respect to motor vehicles in particular, there was testimony from Robert Ross that its sole experience was the importation of a single Rumanian jeep. That jeep,[5] however, and all of the MZ motorcycles, were imported by East Europe with an eye toward establishing an American market. The mere fact that the corporation's best-laid plans did not achieve fruition does not alter its status as a merchant with respect to the goods that were the subject of the transactions here involved.

■ As a merchant engaged in the importation and sale of foreign motor vehicles, East Europe was required under § 2–314(2)(a) to provide Byers with motorcycles that would "[p]ass without objection in the trade under the contract description." The contract clearly called for motorcycles which conformed to all federal standards, as we have seen that the cycles sold to Byers did not.

Moreover, it was at all times clear that Byers purchased the motorcycles from East Europe for the purpose of reselling them to dealers within its area of distribution. Under 15 U.S.C. §§ 1397(a)(3) and 1398(a), however, resale of the motorcycles would have subjected Byers to a civil penalty of up to $1000 for each sale. On these facts, it is evident that the goods were not merchantable as to Byers, and that recovery for breach of implied warranty is proper.

## IV. Common Law Negligence of East Europe.

■■ Count IV of the Complaint raises a claim that East Europe was negligent in its importation of motorcycles which were, by virtue of their failure to conform to safety standards, unfit for resale in the United States. In Maryland, recovery for negligence requires proof that a duty was owed by defendant to plaintiff and that breach of that duty caused damages. 16 M.L.E. Negligence § 2 (1961).

5. The failure to import the jeep in larger numbers was attributed to the prohibitive cost of modifying the prototype to conform to federal standards. Could certification have been achieved at a reasonable cost, East Europe would have imported the jeep for public distribution.

While plaintiff did not address this theory in its pre- or post-trial memoranda, nor expressly raise it at trial, there appears nevertheless to be sufficient evidence in the record to support recovery. Beginning with its initial solicitation of Byers, East Europe held itself out as an importer having skill and expertise in the importation of foreign goods. Byers relied on that expertise to its detriment, suffering financial loss when the goods could not legally be resold without certification. (Testimony of George Byers, Jr., Robert Byers, and John Herzog).

Accordingly, judgment will be entered for Byers on its claim of negligence against East Europe.

## V. *Failure of East Europe and Ross to Furnish Certification.*

Count V of the Complaint recites that federal law required certification of the motorcycles at the time of their importation, and seeks to hold both East Europe and Ross liable for the failure to provide that certification. The action against Ross seeks to pierce the corporate veil and hold him personally liable. For the reasons stated on the record, the court found that the evidence introduced by plaintiff did not justify recovery on a corporate alter ego theory under Maryland law, and granted a directed verdict in favor of Ross. *See Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 340 A.2d 225 (1975); *Dixon v. Process Corp.*, 38 Md.App. 644, 382 A.2d 893 (1978), *cert. denied*, No. 39, September Term, 1978 (April 24, 1978).

The claim against East Europe will largely stand or fall on the question of whether a private cause of action exists for a violation of the statute which requires that certification be furnished, 15 U.S.C. § 1397(a)(3). An examination of the statute itself reveals no express cause of action. Looking to the remainder of the Act, it appears that § 1398 provides for a civil penalty of $1000 for every vehicle sold without such certifica-

tion. Section 1399 empowers the United States Attorney to seek injunctive relief. The only express civil action to be found exists under § 1400(b), and arises where a manufacturer or distributor fails to repurchase from his buyer any motor vehicle "determined not to conform to applicable Federal motor vehicle safety standards," or containing a "defect which relates to motor vehicle safety." An action under § 1400(b) would seemingly require the plaintiff to prove not merely a failure to issue the certification, but the failure of the motorcycles themselves to meet the federal safety standards outlined in 49 C.F.R. §§ 571 *et seq.* No claim was brought under § 1400(b), nor was evidence introduced as to the failure of the motorcycles to meet any specific standard. In any event, the absence of the certificate would not appear to give rise to a cause of action under this section.

In the absence of an express civil remedy, the question is whether an implied right of action may be said to exist. As the Supreme Court has recently emphasized, "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1947, 1953, 60 L.Ed.2d 560 (1979). Whether a private remedy is implied in a statute is determined by an evaluation of the four factors identified in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975):[6]

(1) Is the plaintiff "one of the class for whose *especial* benefit the statute was enacted"?

(2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

(3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

Because the fourth factor in this case merely reinforces the result made clear by the other three, its inclusion in the court's consideration does no injustice to the parties or the law.

---

**6.** The Court has recently indicated that the four variables are not necessarily to be afforded equal weight in addressing this question. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 593, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979).

(4) Is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

■ Under this test, it can hardly be said that an implied cause of action would exist under the Traffic and Motor Vehicle Safety Act for the harm suffered by Byers. First, the statute was not enacted for the especial benefit of motor vehicle distributors. The Congressional purpose, as declared in 15 U.S.C. § 1381, was to protect consumers, the driving public, not merchants.

Second, there is no indication of any Congressional intent to create a private cause of action for one in the position of Byers, but some slight intent to deny one. Section 1397 prohibits the sale or importation of all substandard vehicles, as well as the failure to issue a certificate required by § 1403. Section 1398 provides an express civil penalty for a violation of any provision of § 1397, but no private civil action. Section 1400, moreover, provides a private action for violation of any safety standards, but is silent about the failure to issue a certificate. This distinction between the civil penalty provided under §§ 1397 and 1398, and the private right of action under § 1400, implies some intent on the part of Congress to deny a private civil action for the mere failure to provide a certificate of compliance. *See Touche Ross & Co. v. Redington*, 442 U.S. at 593, 99 S.Ct. at 2488.

Third, the primary Congressional goal, as outlined in § 1381, is "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381. The method provided under § 1397(a)(1) to achieve this purpose, insofar as nonconforming foreign vehicles are concerned, is to halt their importation. Nothing in the Act indicates a desire to provide a private remedy for any plaintiff who is denied a certificate.

Finally, Byers' recovery on Counts I through IV in this case is sufficient testimony to the fact that several adequate state remedies exist for a plaintiff who purchases a motor vehicle upon which no certification sticker appears.

Under the test of *Cort v. Ash*, it would thus be improvident to imply a private cause of action in this case. Accordingly, judgment will be entered for defendants East Europe and Ross on Claim V.

## VI. *Fraudulent Misrepresentation by East Europe and Ross.*

As in Claim V, plaintiff here seeks recovery from Robert Ross as well as from the corporate defendant, East Europe. The claim arises out of alleged misrepresentations by Ross, individually and on behalf of East Europe, made for the purpose of inducing Byers to purchase the MZ motorcycles.

■ The law of intentional misrepresentation in Maryland is set forth in the case of *Appel v. Hupfield*, 198 Md. 374, 84 A.2d 94, 95–96 (1951). In order to recover on this theory, the plaintiff must show:

(1) that a representation made by the defendant was false;

(2) that either its falsity was known to the defendant or the misrepresentation was made with such reckless indifference to the truth as to impute knowledge to him;

(3) that the misrepresentation was made for the purpose of defrauding the plaintiff;

(4) that the plaintiff not only relied upon the misrepresentation but had the right to rely upon it with the full belief in its truth and that he would not have done the thing from which damage resulted if it had not been made; and

(5) that the plaintiff suffered damage directly resulting from the misrepresentation.

■ The court finds from the evidence that Ross continually represented to Byers that the motorcycles conformed to all federal standards, or that the sole defect on the samples was cured for all future shipments

by his purchase of Lucas lighting systems. The evidence, however, does not support a finding that the second and third elements of the *Appel* test were met.

There was credible testimony from Ross tending to show that he did not know his representations were false nor act with reckless indifference to their truth or falsity, but held a good faith belief that the motorcycles complied with applicable federal safety standards. The source of this belief was apparently the East German engineers and technicians, with whom he had discussed those specifications on his trip to Berlin in late 1973 or early 1974.[7] (Testimony of Robert Ross).

Where plaintiff falls far short of the mark is in showing a purpose to defraud. As previously stated, the evidence shows that while Ross may have acted negligently, he appears to have dealt with the Byers people in good faith. The only defect of which he was clearly aware was the lights, and that defect was cured at East Europe's expense prior to the importation of any motorcycles for sale in this country.[8] (Testimony of Robert Ross).

The business of East Europe and the nature of its contractual relationship with Byers further belie any intent to defraud. The contract with Byers was to last one year, with an automatic renewal provision, and called for purchases of 300 motorcycles per month. (Plaintiff's Exhibit No. 2, ¶ 12 and Separate Agreement). East Europe was actively engaged in the development of trade with Communist nations throughout this period, with an increased staff of 20 to 25 office and field personnel. (Testimony of Ross). Their efforts were directed largely toward developing an American market for the MZ motorcycle, in part through more aggressive sales promotion by Byers. (Defendants' Exhibits No. 7, 8).

In light of these several factors which mitigate against the finding of an intent on the part of East Europe to defraud, it simply cannot be found that fraud has been shown by clear and convincing evidence. *See Dixon v. Process Corp.,* 38 Md.App. 644, 382 A.2d 893 (1978), *cert. denied,* No. 39, September Term, 1978 (April 24, 1978). Accordingly, judgment will be entered for defendants East Europe and Ross on plaintiff's Claim VI.

## VII. *Breach of Duty by Connor.*

Plaintiff's Claim VII seeks damages against Connor for breach of its duty to ensure compliance with federal statutes in connection with the importation of the motorcycles.

As a customs broker, Connor has a duty under 19 C.F.R. § 111.29 to "exercise due diligence in . . . the . . . filing of documents relating to any matter handled by him as a broker." Plainly, the admitted failure to file a declaration of compliance as required under 19 C.F.R. § 12.80, or the Form HS–7 used in the importation of motor vehicles was a breach of that duty. (Testimony of Paul F. Connor; Plaintiff's Exhibit No. 29). From this court's Memorandum and Order of January 5, 1979, however, it appears clear that this duty was not owed to Byers:

> The certification requirements of the statute and regulations are an integral part of the Safety Act, and facilitate the achieving of the purpose set forth in 15 U.S.C. § 1381. The certification provisions aid in the administration of a complex regulatory statute; they are not intended to protect a dealer in motor vehicles such as Byers from commercial loss resulting from its purchase of vehicles not in conformance with the Safety Act's requirements.

(Memorandum opinion at p. 7).

Accordingly, for these reasons and those stated on the record in granting a directed

---

7. Ross' testimony that he provided the East Germans with federal standards in 1974 is corroborated by a letter from the manufacturer to Byers dated June 14, 1976. (Plaintiff's Exhibit No. 22).

8. Two or three sample motorcycles were imported without the Lucas lights. These, however, were not held for sale to distributors, and it is uncontroverted that Ross candidly pointed out the lighting defect and explained the modification that would affect future shipments.

verdict on this claim, a judgment shall be entered for defendant Connor on this cause of action.

VIII. *Recovery by Byers as Third-Party Beneficiary of the Contract Between East Europe and Connor.*

The role of Connor in the importation of these motorcycles arose from a demand by Byers that East Europe engage the services of a customs house broker to facilitate their entry, and the recommendation of Connor for that purpose. (Testimony of George Byers, Jr. and Ross). The power of attorney executed by East Europe in favor of Connor is the only legal document to which Connor is a party. (Plaintiff's Exhibit No. 33). No privity of contract exists between Connor and Byers. Accordingly, Byers' contract cause of action against Connor can succeed only upon a finding that Byers was a third-party beneficiary of the contractual relationship between Connor and East Europe.

■■■■ While it is not essential to the creation of a right in the third-party beneficiary that he be identified when a contract is made, in order for him to recover on that contract "it must clearly appear that the parties intended to recognize him as the primary party in interest and as privy to the promise." *Marlboro Shirt Co., Inc. v. American Dist. Tel. Co.*, 196 Md. 565, 77 A.2d 776, 777 (1951); 2 *Williston on Contracts*, § 378 at pp. 954–56 (3rd ed. 1959). There was uncontroverted testimony from the Connor representatives that they never knew of Byers' existence, much less its interest in the motorcycles, until well after entering into the contract. (Testimony of Paul Connor, Joseph Dash). For the reasons stated in open court upon the granting of a directed verdict for Connor, it does not appear on these facts that Byers stands in the position of a third-party beneficiary. Accordingly, judgment on this claim will be entered for Connor.

IX. *Negligence of Connor.*

■■■■ Plaintiff also seeks to maintain an action against Connor for common law negligence in its importation of the motorcycles. Applying the principles of negligence in Maryland to the present circumstances, it must be shown that Connor breached a duty owed to Byers, and that this breach was the cause of damages suffered by Byers.

Even assuming, without discussion, that Connor owed any common law duty to Byers, recovery cannot be had on this theory. The evidence indicates that Connor may have been unaware that the Safety Act applied to motorcycles, despite its receipt of a letter on this subject from the District Customs Director in 1968. (Plaintiff's Exhibit No. 28). Since that time, Connor had imported more than 100,000 automobiles, but the MZ was its first experience with motorcycles. (Testimony of Dash). The letter, six years old by the time of the transactions here involved, would appear to include motorcycles within its definition of "motor vehicles," but nowhere expressly mentions motorcycles.

To whatever extent Connor may have been negligent in its unawareness of the regulations, the court finds that such negligence cannot be the proximate cause of plaintiff's injuries. There was uncontradicted testimony that a customs broker will only rarely, if ever, make a physical inspection of the cargo that it clears through customs. (Testimony of Connor). From their past experience in the importation of automobiles, both of the Connor representatives were able to testify that so long as a certification sticker is properly on the vehicle, a Form HS–7 need not be filed. (Testimony of Connor and Dash). The absence of an HS–7 from the I.D. package received by Connor[9] from East Europe therefore implied that the unseen motorcycles had the proper certification affixed. Moreover, the Customs Service did not contact Connor with respect to any deficiencies in the I.D. package, as it would normally do under

---

**9.** The Immediate Delivery, or I.D., Package is presented by the broker to the Customs Officer at the pier where the goods arrive. Although not the final package prepared for Customs, it contains Customs forms, invoices and other required documents.

general business practices. (Testimony of Connor). Had Customs done so, Connor, under standard procedures, would have merely called East Europe and been told by Ross, pursuant to his understanding, that the motorcycles complied with all federal safety standards.

Byers failed to produce an expert witness to contradict the testimony of the Connor representatives that their action with respect to this transaction was entirely within generally accepted standards of their business. The inescapable conclusion, perhaps unfortunate but nonetheless true, is that in the normal course of business, a customs broker would simply not be expected to discover of its own doing the problems which caused injury to Byers. Even had Connor known that motorcycles were subject to the Safety Act and certain regulations promulgated thereunder, and were thus required to be affixed with certification stickers, the damage to Byers could not have been prevented. It therefore cannot be said that Connor's negligence, if any, in failing to be aware of the Safety Act's applicability, was a proximate cause of the loss suffered by Byers.

For these reasons, as well as those stated on the record in the granting of a directed verdict, judgment on this claim will be entered for defendant Connor.

X. *Negligent Misrepresentation by Robert Ross.*

Plaintiff seeks to hold Ross personally liable for its losses on the theory that Ross negligently misrepresented that the motorcycles would comply with all federal safety standards. This cause of action was not raised in the pleadings, memoranda or pretrial order submitted by the parties, but appeared during the course of the trial. Defendant opposes both the substance of the claim and the grant of leave by the court to permit its consideration as a separate cause of action for negligent misrepresentation.

Fed.R.Civ.P. 15(b) is quite liberal in allowing the amendment of pleadings to conform to the evidence:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

At trial, testimony was adduced on the issue of negligent misrepresentation even before plaintiff expressly made the court aware of its desire to proceed on such a theory as a separate cause of action. Because of its close relation to the fraud claim raised in the pleadings, the evidence was duly admitted. Only after the close of plaintiff's case did defendants become aware of the additional theory, and raise an objection.

In deciding whether to allow amendments under Rule 15(b), the court should be guided by the fundamental concepts of notice and prejudice. 6 Wright & Miller, *Federal Practice and Procedure: Civil* § 1493 at 467–68. While defendants lacked notice of the claim for negligent misrepresentation, it cannot be said that the amendment now sought would be prejudicial in any material sense. In the absence of any showing of such prejudice, the court deems the issue as having been tried by the "implied consent of the parties," and properly in the case.

Plaintiff contends that a cause of action for negligent misrepresentation has been recognized by the Maryland courts. The ancient English rule allowed no recovery for a false statement made with "an honest belief in its truth." *Derry v. Peek*, 14 App. Cas. 337, 374 (1889). This scienter requirement has long survived in England as well as many American common law jurisdictions. Note, *Deceit and Negligent Misrepresentation in Maryland*, 35 Md.L.Rev. 651, 653 (1976).

Maryland, however, at one time clearly followed the more modern rule that under limited circumstances, negligent language may be actionable. In *Virginia Dare Stores, Inc. v. Schuman*, 175 Md. 287, 1 A.2d 897, 899 (1938), the Court of Appeals held that an action may lie for "negligent words" where five elements are found to be present:

(1) a negligently volunteered, erroneous opinion;

(2) intent by defendant that it be acted upon;

(3) knowledge by defendant that plaintiff's reliance would likely cause loss or injury to plaintiff;

(4) action by plaintiff in reliance; and

(5) causation and damages.

While the cases immediately following *Virginia Dare* sought to limit the cause of action to situations involving personal injury, *Holt v. Kolker*, 189 Md. 636, 639, 57 A.2d 287, 288 (1948); *Piper v. Jenkins*, 207 Md. 308, 313, 113 A.2d 919, 921 (1955), more recent cases have allowed recovery where only pecuniary loss was shown. *Brack v. Evans*, 230 Md. 548, 187 A.2d 880 (1963); *Local 75, United Furniture Workers v. Regiec*, 19 Md.App. 406, 311 A.2d 456 (1973). The present state of the law in this area, however, can only be described as highly unsettled, in light of the latest Court of Appeals decision in *Delmarva Drilling Co. v. Tuckahoe Shopping Center, Inc.*, 268 Md. 417, 302 A.2d 37 (1973).

The *Tuckahoe* case was tried as an action for negligent misrepresentation, and damages were awarded to a third-party plaintiff on that theory. Reversing, the Court held that "there can be no recovery in an action for deceit on the ground of negligent misrepresentation." 302 A.2d at 41. Read literally, this case would appear to recognize an action only for deceit or fraudulent misrepresentation, requiring an element of scienter. *But see Regiec, supra.* In any event, recovery on a claim of negligent misrepresentation in Maryland is no longer clear.

Even prior to the measure of confusion added by *Tuckahoe*, one commentator noted that it was uncertain "whether in Maryland a plaintiff can recover in negligence for misrepresentations made by a defendant with whom the plaintiff has entered into a contract following arms-length bargaining when the misrepresentations are part of the basis of the bargain." 35 Md.L.Rev. at 670. To allow recovery in the present case would require answering that open question in the affirmative, absent any substantial guidance from the Maryland courts. In light of the denial of recovery for a negligent misrepresentation under similar circumstances in *Tuckahoe*, such a course would be most unwise.

Moreover, the present case is an additional step removed from the factual situation in *Tuckahoe*. Here, recovery on the ground of negligent misrepresentation is sought not against the principal with whom plaintiff entered into a contractual relationship, but from an agent of that disclosed principal. No case has been found in which an agent has been held personally liable under such circumstances.[10]

■ To reiterate the court's disposition of this issue, defendant's objection to plaintiff's cause of action for negligent misrepresentation is noted, but the pleadings are hereby deemed amended under Rule 15(b) to include that claim. In light of the muddled state of Maryland law, however, the court has great misgivings about allowing recovery against any defendant on such grounds. Where, as here, the action for negligent misrepresentation lies not against the contracting principal (East Europe), but personally against the negotiating agent

---

**10.** Only two cases from foreign jurisdictions have been found in which recovery was had for negligent misrepresentations which induced the formation of a contractual relationship. *See International Products Co. v. Erie R. R.*, 244 N.Y. 331, 155 N.E. 662 (1927); *Weston v. Brown*, 82 N.H. 157, 131 A. 141 (1925). *International Products* involved two companies; the agent who had negotiated the contract for the defendant company was not made a party. *Weston* was a case between two individuals who contracted for the sale of land; no agent was involved in the transaction.

(Ross), the reasons for denying recovery are even stronger. Accordingly, judgment will be entered for defendant Ross on plaintiff's claim for negligent misrepresentation.

XI. *Damages.*

 Plaintiff offered as an exhibit at trial a Summary of Damages divided into three parts. (Plaintiff's Exhibit No. 31). Part I represented an actual loss of $231,-120.42. Part II itemized incidental damages totaling $89,609.66. Part III sought consequential damages for lost profits of $353,760.00.

The court finds plaintiff's claims for actual and incidental damages to be adequately substantiated by the testimony of witnesses at trial. As to consequential damages, however, the claim will be disallowed for the reasons stated in open court. Accordingly, the liability of defendant East Europe on Claims I, II, III, and IV is found to be the sum of actual loss and incidental damages, a total of $320,730.08.

XII. *Counterclaim by East Europe and Ross.*

 Defendants East Europe and Ross have filed a counterclaim seeking damages of $576,000 for an alleged breach of contract by plaintiff. The substance of the claim is that from August of 1974 forward, plaintiff was in breach of its contractual obligation to purchase from East Europe a minimum of 300 motorcycles per month.

The court finds that the claimed obligation did in fact exist under the Separate Agreement between the parties, but was canceled by plaintiff, in accordance with its contractual rights, upon notice of a price increase in August of 1974. In any event, East Europe itself was already in breach of the contract by that time, and had been so for a period of four months. The evidence shows that in March and April plaintiff received its first shipments of motorcycles, without the tune-up parts necessary to service the motorcycles prior to sale and required under the contract. Further, the failure to provide a legally required certificate of compliance with federal safety standards placed East Europe in breach from the date the first motorcycles were received by plaintiff. That the Byers people may have been ignorant of these material breaches until some later date does not alter the conclusion that plaintiff is not liable on East Europe's counterclaim for breach of contract. 6 *Williston on Contracts,* § 839 at 141 (3rd ed. 1962).

XIII. *Conclusion.*

Accordingly, it is this 4th day of January, 1980, ORDERED:

1. That plaintiff be awarded the sum of $320,730.08 against defendant East Europe Import Export, Inc. on Claims I, II, III, and IV;

2. That judgment be entered for defendants East Europe and Robert Ross on plaintiff's Claims V and VI;

3. That judgment be entered for defendant John S. Connor, Inc. on plaintiff's Claims VII, VIII, and IX;

4. That judgment be entered for defendant Robert Ross on plaintiff's Claim VI, as amended, for negligent misrepresentation; and

5. That judgment be entered for plaintiff and counter-defendant George Byers Sons, Inc. on the counterclaim of defendants and counter-plaintiffs East Europe and Robert Ross.

Although not designated as such, this Memorandum and Order constitutes the findings of fact and conclusions of law reached by this court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.